[No. S107855. Aug. 5, 2004.]

JONATHAN NEIL & ASSOCIATES, INC., Plaintiff and Appellant, v.
FREDDIE JONES, Defendant, Cross-complainant and Appellant;
MILDRED JONES et al., Cross-complainants and Appellants.
CAL-EAGLE INSURANCE COMPANY, Cross-defendant and Appellant;
JOHNSEY INSURANCE COMPANY, Cross-defendant and Respondent.

918

920

**COUNSEL**

Fried, Frank, Harris, Shriver & Jacobson, Richard A. Brown, B. Randol Schoenberg; Greines, Martin, Stein & Richland, Irving H. Greines, Robin Meadow, Tyna Thall Orren and Peter O. Israel for Plaintiff and Appellant and for Cross-defendant and Appellant.

Sedgwick, Detert, Moran & Arnold, Christina J. Imre and Stephanie Rae Williams for Aetna Healthcare of California and Aetna Life Insurance Company as Amici Curiae on behalf of Plaintiff and Appellant and Cross-defendant and Appellant.

Sonnenschein Nath & Rosenthal, Thomas E. McDonald and Sanford Kingsley for California Automobile Assigned Risk Plan as Amicus Curiae on behalf of Plaintiff and Appellant and Cross-defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, David S. Chaney, Assistant Attorney General, and Elisa B. Wolfe-Donato, Deputy Attorney General as Amici Curiae on behalf of Plaintiff and Appellant and Cross-defendant and Appellant.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad, Cheryl Dyer Berg and Sean McEneaney for California Workers' Compensation Institute, Association of California Insurance Companies and Fireman's Fund Insurance Company as Amici Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner and S. Thomas Todd for State Compensation Insurance Fund as Amicus Curiae on behalf of Cross-defendant and Appellant.

Heller Ehrman White & McAulife, Vanessa Wells, Victoria Collman Brown and Jessica Rossman for State Farm Mutual Automobile Insurance Company as Amicus Curiae on behalf of Cross-defendant and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, Wendy S. Loyd and David W. Burnett for Defendant, Cross-complainant and Appellant and for Cross-complainants and Appellants.

Robert S. Gerstein; Gianelli & Morris, Robert S. Gianelli and Sherril Nell Babcock for Consumer Attorneys of California as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant and Cross-complainants and Appellants.

Emerson Corey & Barsotti and Todd B. Barsotti for Cross-defendant and Respondent.

## OPINION

**MORENO, J.**—In this case, a trucking company participated in the California Automobile Assigned Risk Plan (the CAARP), a statutorily created program governed by the Insurance Commissioner designed to make automobile liability insurance available to those unable to obtain insurance through ordinary methods. After a premium billing dispute with its insurance company, which was hired by the CAARP, the trucking company defended a collection action and filed a cross-complaint against the company alleging that it had retroactively and knowingly charged it a substantially higher premium than was actually owed, and was therefore liable for tortious breach of the covenant of good faith and fair dealing and for fraud. A jury found in favor of the trucking company.

We are asked to decide two questions. The first is whether the trucking company was required to exhaust the administrative remedies available to those participating in the CAARP before bringing a lawsuit in which the central issue was the determination of the proper premium to be charged, a matter governed by the CAARP's and the Insurance Commissioner's internal regulations. We conclude that exhaustion of remedies was not required but that, as the Court of Appeal alternately held, the doctrine of primary jurisdiction required the trial court to stay proceedings and refer the premium billing dispute to the Department of Insurance (DOI) and the Insurance Commissioner. Its failure to do so required reversal of the judgment in the trucking company's favor.

The second question concerns our understanding of when tort damages will be available for an insurance company's breach of the implied covenant of good faith and fair dealing. The remedy for breach of that covenant is generally limited to contract damages, but we have recognized an exception to this rule when the breach occurs in the context of an insurance company's failure to properly settle a claim against an insured, or to resolve a claim asserted by the insured. (See *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) The question presented by this case is whether an insurance company's breach of the covenant sounds in tort when it retroactively overcharges a premium it knows is not owed. The trial court concluded that tort remedies were available but the Court of Appeal disagreed and reversed. We conclude, for reasons explained below, that the Court of Appeal is correct.

## I. FACTS

The factual underpinnings of this case are lengthy and complex. For purposes of this case the following summary, taken in part from the Court of

Appeal opinion, will suffice. Freddie and Mildred Jones owned a trucking company, known as Jones Trucking (henceforth sometimes referred to collectively as the Joneses). In 1991, after the Joneses' private insurance company went out of business, they applied for and obtained, at their insurance broker's recommendation, an insurance policy through the CAARP. An understanding of this program and one of the rules promulgated by the program is necessary for comprehending the facts of this case.

## A. *The CAARP and Rule 23*

The CAARP was established under section 11620 of the Insurance Code, requiring the Insurance Commissioner to "approve or issue a reasonable plan" to provide liability insurance for those "who are in good faith entitled to but are unable to procure that insurance through ordinary methods." In general, the plan assigns such insureds to the various companies who write insurance in California and regulates the premiums that can be charged to such insureds. This assigned risk insurance is generally issued at the minimal levels required by the financial responsibility law. (See Ins. Code, § 11622.) The program is administered through the so-called CAARP committee, which is advisory to the Insurance Commissioner (see *id.*, § 11623, subd. (a)). The committee "with the approval of the commissioner shall appoint a manager to carry out the purposes of this article, employ sufficient personnel to provide services necessary to the operation of the plan, and contract for the provision of statistical and actuarial services." (*Ibid.*) The CAARP committee is, by statute, composed of eight employees of insurance companies that write assigned risk policies, four public members, two representatives of insurance agencies, and the Insurance Commissioner or his or her designee. (*Ibid.*)

There are certain classes of vehicle users whose financial exposure (and potential danger to the public) is much greater than is contemplated by the ordinary assigned risk placement. Among these is the class of commercial truckers. In order to accommodate these higher risk vehicle users, the Insurance Commissioner in 1978 promulgated (by regulation at Cal. Code Regs., tit. 10, § 2432 et seq.) the Commercial Automobile Insurance Procedure (CAIP). The assigned risk plan for truckers is also administered by the CAARP committee, of which there is a separate CAIP subcommittee that handles policy issues arising from truckers insurance.

CAARP hires two "servicing carriers" (Cal. Code Regs., tit. 10, § 2432, subd. (e)), who provide all of the insurance policies issued under the CAIP. These carriers have a contract with the CAARP by which they are paid a percentage of the premium as a fee for their services. They turn all premiums over to CAARP and charge all claims to the CAARP, which then distributes the charges among automobile liability carriers in California. Thus, the

servicing carriers are not typical insurance companies in the sense of a company putting its own assets at risk through its underwriting and premium practices. Instead, risk is borne by the insurance industry at large, underwriting and premium practices are specified by the CAARP and the DOI, and the servicing carrier is paid a commission for implementing and administering the program, based on premiums billed. Cal-Eagle Insurance Company (Cal-Eagle) became one of the servicing carriers in 1991.

The CAARP is run according to rules promulgated by the DOI and contained in the California Automobile Assigned Risk Plan Manual of Rules and Rates. (See Cal. Code Regs., tit. 10, § 2498.5.) Of particular relevance is rule 23 of the manual (rule 23), which governs the premiums assessed to truckers for their use of independent truckers, or subhaulers. In general, insured truckers' premiums are determined by the number of trucks they own and operate. But the California Public Utilities Commission (PUC), which at the time this controversy arose regulated truckers such as the Joneses,[1] required these subhaulers to have their own PUC certificates of authority and their own liability insurance. The Joneses made extensive use of subhaulers, paying out over half their annual gross receipts to them.

The testimony indicated that California was somewhat unique in issuing PUC certificates directly to subhaulers, with the attendant requirement that the subhauler have its own insurance. In other states, according to the testimony, only the primary trucking company had insurance and the hired carriers were covered under that insurance. In its original form, California's rule 23 incorporated the generic nationwide rule, resulting in uncertainty concerning the way the rule applied in California.[2]

---

[1] In 1996, regulatory authority was shifted to the Department of Motor Vehicles and the California Highway Patrol (see Veh. Code, § 34600 et seq.).

[2] Specifically, paragraph C of rule 23, as it existed at the time the Joneses' policy was issued, provided two alternative methods of calculating premiums. The first alternative provided that "[t]ruckers may be written on a specified car basis according to the Trucks, Tractors and Trailers Classification Rule." The second alternative rule of the original rule 23 C was that premiums could be charged on a "cost of hire" basis. In order to determine the premium on this basis, the servicing carrier was required to first determine the average premium for listed tractors and trailers under the policy, then multiply that average rate by .0033 to obtain the "cost of hire rate." The servicing carrier was then to determine the insured's total cost of hiring the subhaulers and compute the insurance premium by "multiplying each $100 of the total amount estimated for the cost of hire . . . by the cost of hire rate." Nowhere in the rule was the word "subhauler" used; the relevant portion of the rule referred only to a "contract involving the hire of trucks, tractors and trailers."

Rule 23 was rewritten by the DOI after a two-year period of study and consultation with the insurance industry. The revised rule, tailored to the California situation, specifically applied to exposure based on a "subhauling agreement involving the hauling of goods on behalf of an insured trucker by a hired carrier."

The revised rule recognized that in some circumstances the primary trucker's insurance would be called upon only to provide excess coverage if a claim exceeded the limits of liability of the subhauler's insurance, thereby justifying substantially lower premiums. Thus, the revised rule stated, at paragraph C.2.a(2): "The insured trucker may request and the CAIP Servicing Carrier shall provide coverage for the hired carrier exposure on an excess basis where an insured trucker demonstrates at the time of application or upon renewal that all of the following criteria are satisfied and such criteria remain satisfied throughout the policy period . . . ." The five criteria, set forth in the margin,[3] address both the form and the substance of the relationship between the trucker and the subhauler. The premium applicable if the insured trucker is able to satisfy all criteria is only 4 percent of the otherwise applicable premium.

The revised rule also modified the otherwise applicable premium. Although the premium was based on the cost of hiring the subhaulers, as had been the case under the original rule 23, the base multiplier was reduced from .0033 to

---

[3] These criteria were: "(a) Any hired carrier with whom the insured trucker contracts to carry or subhaul must operate under its own California PUC operating authority.

"(b) No written lease or oral rental agreement shall exist between the insured trucker and the hired carrier; however, a separate, written subhaul agreement which complies with California PUC requirements shall be executed between the insured trucker and the hired carrier. This subhaul agreement shall make the hired carrier's insurance primary, make the hired carrier responsible for all claims and/or liabilities, name the insured trucker as an additional insured on the hired carrier's policy, provide that the hired carrier's insurer will notify the insured trucker if the hired carrier's policy is canceled, and require minimum limits of not less than the applicable California PUC-required minimum limits.

"(c) The insured trucker shall have on file copies of all subhaul agreements for audit by the CAIP Servicing Carrier.

"(d) The insured trucker shall not dispatch or exert any control over the means by which the hired carrier fulfills the obligations of the subhaul agreement; the hired carrier shall exercise independent control over the equipment operated and the drivers or persons operating that equipment.

"(e) The insured trucker shall maintain a separate subhaul register which complies with California PUC requirements. This register shall be made available for audit and/or review by the CAIP Serving Carrier, the Plan, and/or the California Insurance Commissioner.

"(f) The CAIP Servicing Carrier, the California Insurance Commissioner, and the Plan shall have access to the insured trucker's books and records for a period of three years after the date of cancellation or non-renewal of the policy to audit and determine compliance with the requirements of this section. If upon audit it is determined that there has not been compliance with the requirements of this section, the premium for the hired carrier exposure will be recomputed in accordance with the provisions of paragraph C.2.b. below."

.0011. The revised rule required that "the total cost of hiring" would be calculated on the basis that each subhauler's vehicle was hired for a minimum of $60,000 of work per year.

As the revised rule was implemented from September of 1992 forward, certain problems revealed themselves. Some of the problems occurred because the DOI required the carriers to implement the rule on a retroactive basis if requested by insureds. Many insureds did not have the required detailed records readily available to establish their eligibility for the five criteria for excess coverage. Further, smaller truckers like the Joneses did not use any particular subhauler for anywhere near $60,000 of work per year.

## B. *The Joneses' Premium Dispute*

The Joneses' insurance application under the CAARP and CAIP was assigned to Cal-Eagle by the assigned risk program office. They purchased a one-year commercial assigned risk liability insurance policy from Cal-Eagle in March 1991, when the old rule 23 was still in effect. Cal-Eagle issued a policy in a form required by the DOI. It charged the Joneses an initial estimated annual premium of $14,088, based on the Joneses' use of their own, specified vehicles in the business. Over the term of the policy, Cal-Eagle assessed additional premiums as the Joneses added equipment to their fleet. The total premiums charged and paid during the policy year was approximately $20,000.

The Cal-Eagle policy issued to the Joneses permitted it to reassess the initial premium based on new information. As the policy stated: "The premium for this policy is based on information we have received from you or other sources. You agree: [¶] a. that if any of this information material to the development of the policy premium is incorrect, incomplete or changed, we may adjust the premium accordingly during the policy period. [¶] b. to cooperate with us in determining if this information is correct and complete, and to advise us of changes in this information." The policy also provided: "The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures."

After the policy period expired, Cal-Eagle did an audit of the Joneses to make sure all vehicles used in the business had been accounted for in the calculation of premiums. Auditors discovered the Joneses' extensive use of subhaulers, and Cal-Eagle assessed the Joneses, under old rule 23, another

$111,523 in insurance premiums for the coverage period that had just expired. Cal-Eagle reaudited the Joneses under new rule 23 and adjusted the premium to $51,294.

The Joneses believed the retroactive premium charge was in error and that the charges for subhaulers should have been on an excess basis under the new rule 23, as explained above. After the initial reaudit, but before learning of the downward adjustment of the premium, the Joneses sought the help of the DOI. They were eventually routed to Elizabeth Mohr, the DOI attorney principally in charge of the CAARP. After speaking with Mohr, the Joneses received a consumer complaint form, which they filled out and returned to the DOI's Consumer Services Division as directed. In response, the Rating Services Bureau of the DOI's Consumer Services Division acknowledged the complaint and wrote to Cal-Eagle asking for an explanation of the premium increase.[4]

Cal-Eagle replied in a letter to the Joneses, copied to the DOI, that upon physical audit, "it was determined that there were additional vehicles to be added," and it had applied the primary insurance rate for these subhaulers because not all of revised rule 23's requirements for an excess rate were met. The reply further advised that Cal-Eagle was "removing several vehicles" and represented that "a copy of the auditor's report is attached." Cal-Eagle informed the DOI of the readjustment resulting from the reaudit. Cal-Eagle did not, however, provide the second page of the audit report stating that its auditor had insisted that the "audit must be done based on the records available at the time of the audit" and had refused the Joneses' request for "60 days to recreate their records."

Based on Cal-Eagle's response, the DOI wrote the Joneses advising them that the premium had been reduced and that "unless you can meet" the guidelines in the auditor's report with which they "must comply" by providing Cal-Eagle with the "correct information," there was "nothing further the department can do to cause your premiums to be reduced further." The DOI's response did not evidence any awareness of the controversy between the Joneses and Cal-Eagle over whether the former would be permitted time to recreate their records to establish excess-basis coverage for subhaulers.

Although Cal-Eagle had a general policy to inform its insureds about the administrative grievance appeals procedure available through the CAARP (see Cal. Code Regs., tit. 10, § 2495), it did not inform the Joneses about the

---

[4] The Joneses filed a complaint through the DOI's generic complaint process pursuant to Insurance Code section 12921.1. According to testimony by DOI employees, this process was viewed as an alternative to the procedure specifically designated for CAARP complaints (see Cal. Code Regs., tit. 10, § 2495), with both procedures terminating in an appeal to the Insurance Commissioner.

availability of such an appeal when they complained to Cal-Eagle about the additional premium. The Joneses did not file an appeal with the CAARP.

The Joneses declined to pay the additional premium. Cal-Eagle assigned its claim to Jonathan Neil & Associates, Inc., a collection agency, which sued the Joneses for the balance due on the premium. The Joneses responded with a cross-complaint, initially for bad faith and subsequently amended to state a fraud cause of action.

Cal-Eagle moved for summary judgment on two bases: that the Joneses failed to state a tort cause of action for breach of the covenant of good faith and fair dealing and that they had failed to exhaust their administrative remedies. The trial court denied the motion. Cal-Eagle petitioned the Court of Appeal for writ relief, which the court summarily denied.

The trial was divided into three phases. Phase I was a trial to the court without a jury on certain matters of interpretation of various DOI rules and regulations, including the meaning of rule 23 above, as well as other legal questions on statutes and policy language. Phase II was a trial to the jury of the complaint and cross-complaint. The jury found the Joneses owed no additional premiums and found Cal-Eagle liable for breach of the implied covenant of good faith and fair dealing and for fraud. It awarded the Joneses $2,027,167 in compensatory damages from Cal-Eagle: $409,783 for lost profits, based on the Joneses testimony that uncertainty over the $51,294 premium bill caused them to close their business; $275,000 each in emotional distress damages to Freddie and Mildred Jones; and $1,067,384 for attorney fees and costs pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. Phase III was a trial to the jury concerning the amount of punitive damages to be awarded. The jury awarded punitive damages against Cal-Eagle in the amount of $11,445,714.23. In posttrial proceedings, the trial court conditioned its denial of a new trial motion on remittitur of the punitive damages award to $4,350,887. While preserving their right to cross-appeal, the Joneses consented to the remittitur.

Cal-Eagle and Jonathan Neil & Associates, Inc. (hereafter collectively Cal-Eagle), filed timely notices of appeal, as did the Joneses. The Court of Appeal reversed. It first held that as a matter of law, tort damages are not available for the breach of an implied covenant of good faith and fair dealing in an insurance contract when the breach involves a dispute over premiums, as opposed to matters concerning payment or settlement of insurance claims. The Court of Appeal also concluded that the Joneses were required to exhaust their administrative remedies with the DOI, or alternatively that the doctrine of primary jurisdiction required an initial resort to such remedies before bringing a lawsuit. Because the Joneses failed to fully avail themselves of

such remedies, the court reversed the trial court's judgment and remanded with directions to stay proceedings until DOI remedies had been exhausted. We granted review to consider both issues.

## II. Discussion

### A. *Exhaustion of Administrative Remedies*

The first question posed by this case is whether the Joneses failed to exhaust their administrative remedies with the DOI, or, in the alternative, whether the doctrine of primary jurisdiction requires the DOI to initially decide the questions of the proper premium to be charged. We conclude that the latter doctrine is implicated here and that the judgment should be reversed on that basis.

■ Our discussion of the exhaustion doctrine in *Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373] (*Rojo*) shows that the doctrine consists of at least three distinct strands, justified by somewhat different rationales. First, when a statute and lawful regulations pursuant thereto establish a quasi-judicial administrative tribunal to adjudicate statutory remedies, the aggrieved party is generally required to initially resort to that tribunal and to exhaust its appellate procedure. "As Witkin explains: 'The administrative tribunal is created by law to adjudicate the issue sought to be presented to the court. The claim or "cause of action" is within the special jurisdiction of the administrative tribunal, and the courts may act only to *review* the final administrative determination. If a court allowed a suit to be maintained prior to such final determination, it would be interfering with the subject matter jurisdiction of another tribunal.' " (*Id.*, at p. 85, quoting 3 Witkin, Cal. Procedure, Actions (3d ed. 1985) § 234, at p. 265.)

■ Second, the exhaustion doctrine has been applied when a private or public organization has provided an internal remedy. (See *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake*).) Whereas the exhaustion requirement in the first category is based on a discernment of legislative intent, the second category is more a matter of judicial policy: "The reason for the exhaustion requirement in this context is plain. . . . '[W]e believe as a matter of policy that the association itself should in the first instance pass on the merits of an individual's application rather than shift this burden to the courts. For courts to undertake the task "routinely in every such case constitutes both an intrusion into the internal affairs of [private associations] and an unwise burden on judicial administration of the courts." [Citation.]' " (*Rojo, supra,* 52 Cal.3d at p. 86.) In this context, the "exhaustion of administrative remedies furthers a number of important societal and governmental interests,

including: (1) bolstering administrative autonomy; (2) permitting the agency to resolve factual issues, apply its expertise and exercise statutorily delegated remedies; (3) mitigating damages; and (4) promoting judicial economy." (*Ibid.*)

■ Third, courts have required "exhaustion of 'external' administrative remedies in a variety of public contexts." (*Rojo, supra,* 52 Cal.3d at p. 87.) In such cases, although the legislative intent to resort in the first instance to administrative remedies is not entirely clear, courts have required exhaustion when they "have expressly or implicitly determined that the administrative agency possesses a specialized and specific body of expertise in a field that particularly equips it to handle the subject matter of the dispute. Typical of these is *Karlin v. Zalta* (1984) 154 Cal.App.3d 953 [201 Cal.Rptr. 379], involving a physician's class action for equitable relief and damages arising out of defendant insurers' alleged charging of excessive malpractice insurance premium rates . . . . [¶] . . . [T]he court held plaintiffs were required to exhaust their administrative remedies under the McBride Act (Ins. Code, §§ 1850–1860.3). Citing the 'factual complexities' of medical malpractice insurance ratemaking and the McBride Act's 'pervasive and self-contained system of administrative procedure' for monitoring rates and relevant market conditions, the court determined the excessive-rates issue was a matter 'singularly within the technical competence of the Insurance Commissioner through the enlistment of agency resources.' (154 Cal.App.3d at p. 983.) In these circumstances, the court held, 'it is indispensable that the expertise of the insurance commissioner and the agency's staff be initially engaged to make such review.' " (*Rojo, supra,* 52 Cal.3d at p. 87.)

■ In addition to the above three categories, we have recognized in some cases that although exhaustion is not required, the doctrine of "primary jurisdiction" of administrative agencies, long used in federal law, should be invoked to require resort to an administrative agency to resolve issues within its particular area of expertise. In *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730] (*Farmers Ins. Exchange*), we explained that exhaustion and primary jurisdiction are "two closely related concepts [citation]. 'Both are essentially doctrines of comity between courts and agencies. They are two sides of the timing coin: Each determines whether an action may be brought in a court or whether an agency proceeding, or further agency proceeding, is necessary.' [Citation.] [¶] . . . ' *"Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone*; judicial interference is withheld until the administrative process has run its course. *"Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts*, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is

suspended pending referral of such issues to the administrative body for its views.' [Citations.]" (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 390.)

"The policy reasons behind the two doctrines are similar and overlapping. The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary). [Citations.] . . . [T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. [Citations.]

"No rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate situations, as required by the interests of justice." (*Farmers Ins. Exchange, supra,* 2 Cal.4th at pp. 391–392, fns. omitted.)

In *Farmers Ins. Exchange,* the Attorney General brought suit against various insurance companies, asserting that they violated Insurance Code sections 1861.02 and 1861.05 by refusing to offer good driver discounts to appropriate applicants and sufficient discounts to those who qualified. The Attorney General also alleged that the violation of these provisions constituted an unlawful business practice actionable under the Unfair Practices Act, Business and Professions Code section 17000 et seq. We concluded that the Insurance Code claims "presented a question of exhaustion of administrative remedies; the People [cannot] litigate Insurance Code claims over which the Insurance Commissioner has been given exclusive jurisdiction without first invoking and completing the available administrative process set out in the Insurance Code. [Citation.] By contrast, . . . [t]he Business and Professions Code claim . . . is 'originally cognizable in the courts,' and thus it triggers application of the primary jurisdiction doctrine." (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 391.)

We further concluded that the primary jurisdiction doctrine was properly invoked: "First, . . . the Insurance Commissioner has at his disposal a 'pervasive and self-contained system of administrative procedure' (*Rojo, supra,* [52 Cal.3d] at p. 87) to deal with the precise questions involved herein. [¶] Second, and more important, based on the allegations in the People's complaint, there is good reason to require that these administrative procedures be invoked here. . . . [W]e conclude that considerations of judicial

economy, and concerns for uniformity in application of the complex insurance regulations here involved, strongly militate in favor of a stay to await action by the Insurance Commissioner in the present case." (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 396.) "It seems clear to us that the Insurance Commissioner is best suited initially to determine whether his or her own regulations pertaining to eligibility [for a Good Driver Discount] have been faithfully adhered to by an insurer. [¶] Similarly, the determination of whether a given Good Driver Discount policy comports with the '20 percent discount' provision of the statute also calls for exercise of administrative expertise preliminary to judicial review." (*Id.* at p. 399.)

██ As discussed, the chief distinction between the two doctrines is that the "primary jurisdiction" doctrine applies to cases "originally cognizable in the courts" (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 390), whereas exhaustion generally applies to certain statutory claims initially cognizable by an administrative agency (see *Rojo, supra,* 52 Cal.3d at p. 83 [Fair Employment and Housing Act claimants statutorily required to exhaust administrative remedies]). Another related distinction between the two doctrines is that in the case of exhaustion, the administrative agency must initially decide the "entire controversy," whereas under the primary jurisdiction doctrine, the court "makes its own decision" based in part on the agency's decision on an issue or issues within the case. (Koch, Administrative Law and Practice (2d ed. 1997) § 13.24, p. 357.)[5]

██ We conclude that the doctrine of primary jurisdiction rather than exhaustion of remedies should be applied here. Both Cal-Eagle's suit for breach of contract and the Joneses' cross-claim for breach of the covenant of good faith and fair dealing and fraud are originally cognizable in court. The Insurance Commissioner has no authority to decide these common law claims, but can only make a determination regarding some of the issues in the case. Nor can we discern in Insurance Code section 11620 et seq. an absolute statutory bar to prosecuting such claims absent a prior administrative determination.

---

[5] The above distinctions are not entirely borne out by California case law. In particular, cases affirming the requirement to exhaust *internal* remedies sometimes involve common law claims, perhaps because the organization cannot be said to have made a final decision on the matter affecting the common law claim until the organization's internal remedies are exhausted. (See, e.g., *Westlake, supra,* 17 Cal.3d 465 [exhaustion required in physician's suit for damages against hospital revoking his staff privileges]; *Robinson v. Templar Lodge, I.O.O.F.* (1897) 117 Cal. 370 [49 P. 170] [failure to exhaust internal remedies defeats contract claim against fraternal lodge], disapproved on other grounds in *Westlake, supra,* at p. 479.) In any event, the present case does not fit readily into this "internal remedy" category. The administrative remedies of the CAARP, which are part of a comprehensive regulatory framework, more closely resemble those found in *Farmers Ins. Exchange* than they do the internal organizational remedies of a hospital or other private organization found in *Westlake* and similar cases.

That being said, the case for invoking the primary jurisdiction of the Insurance Commissioner is compelling. The issues raised in the Joneses' cross-complaint directly implicate the regulatory authority and expertise of the Insurance Commissioner. What we stated in *Farmers Ins. Exchange* applies with at least as much force in this case: "the Insurance Commissioner has at his disposal a 'pervasive and self-contained system of administrative procedure' " (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 396), in the form of an assigned risk program heavily regulated and indeed ultimately governed by the Commissioner. As discussed, the CAARP was created by the Insurance Commissioner pursuant to Insurance Code section 11620, in order to accomplish the important public purpose of providing automobile liability insurance to those unable to obtain such insurance by "ordinary methods." The CAARP committee and CAIP subcommittee are advisory to the Insurance Commissioner, pursuant to Insurance Code section 11623, subdivision (a). One of the statutorily required features of the CAARP is the establishment of an "appeal to the commissioner by persons who believe themselves aggrieved by the operation of the plan." (Ins. Code, § 11624, subd. (b).) Pursuant to this statute, the Insurance Commissioner has adopted section 2495 of title 10, California Code of Regulations, which provides in pertinent part that "Any . . . insured . . . under the plan who is affected by any act, ruling, decision or order of an insurer, the manager or the [CAARP] committee" may complain to the committee, with the committee's decision eventually appealable to the Insurance Commissioner, who will then "render a decision which shall be binding upon all parties."

Furthermore, as in *Farmers Ins. Exchange,* "concerns for uniformity in application of the complex insurance regulations here involved, strongly militate in favor of a stay to await action by the Insurance Commissioner in the present case." (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 396.) Premiums under the CAIP for truckers such as the Joneses are set according to rules promulgated by the DOI and the CAARP. At the heart of the present controversy is a dispute about an interpretation and application of rule 23 regarding the method of computing insurance premiums to cover an insured trucking company's subhaulers under the CAIP, including the type of documentation required to qualify for a retroactive assessment of the premium on an "excess" basis in conformity with paragraph C.2.a(2) of the rule. The DOI's interpretation and application of these regulations in the first instance is necessary to secure regulatory uniformity informed by its expertise and extensive experience with this area of regulation. Indeed, the Insurance Commissioner, as amicus curiae, vigorously argues in favor of an exhaustion of remedies requirement as a means of securing such regulatory uniformity.

The conduct of the trial that did occur in this case, without the benefit of the Insurance Commissioner's final determination of the premium issues, confirms the need to afford the Insurance Commissioner primary jurisdiction.

The record reveals that at least six witnesses currently or formerly employed by the DOI testified about the operation of rule 23 or the inner workings of the CAARP. The Joneses, in their opening brief in the Court of Appeal, stated that the jury trial was tantamount to "a two (2) month training course on Assigned Risk underwriting, auditing, and premium calculation." Such time and expense was in addition to the similar "training course" the trial court had to undergo in phase I of the trial. The reliance on DOI experts and the need to intensively "train" the judge and jury on the fine points of an insurance regulatory scheme illustrate the folly of bypassing a statutorily authorized grievance process within the DOI, operated by employees who would not require such training, and who might have been able to expeditiously resolve the matter.

We conclude for all the above reasons that the trial court abused its discretion in not staying the proceeding and referring the premium dispute issue to the DOI. The proper remedy is to reverse the judgment and direct such reference occur on remand. (See *General American Tank Car Corp. v. El Dorado Terminal Co.* (1940) 308 U.S. 422, 433 [84 L.Ed. 361, 60 S.Ct. 325] [appropriate to stay judicial proceedings already initiated, even when trial has concluded, to permit administrative determination of issues pertinent to the litigation].) The fact that a lengthy trial has already been held, which may well have been unnecessary, highlights the need for trial and appellate courts to timely apply the primary jurisdiction doctrine when appropriate.[6]

The Joneses also claim, in effect, that they have already exhausted their administrative remedies. As discussed, the Joneses did file a complaint through the DOI's generic complaint process pursuant to Insurance Code section 12921.1. The department official, after an apparently superficial investigation, concluded that the Joneses would be required to submit more paperwork regarding their subhaulers, as requested by Cal-Eagle. The Joneses contend that Cal-Eagle misrepresented to the DOI the paperwork requirements imposed on the Joneses, and also strenuously, and not unpersuasively, argue that these requirements were intrinsically unfair and impossible to meet. But the Joneses did not attempt to inform the DOI of Cal-Eagle's misrepresentation, nor to press the matter with the DOI personnel in charge of handling the complaint, much less pursue an appeal. The Joneses also contend that Cal-Eagle did not inform them of the CAARP appeal process. But such a process was public information and there was no indication that the Joneses, who were represented by counsel at this point and who were

---

[6] We note that our holding regarding the primary jurisdiction of the Insurance Commissioner does not extend to all disputes between insureds and insurers participating in the CAARP but only to those disputes within the CAARP's jurisdiction. (See *Hightower v. Farmers Ins. Exchange* (1995) 38 Cal.App.4th 853, 860 [45 Cal.Rptr.2d 348] [CAARP committee's regulatory authority limited to such matters as issuance of assigned risk policies and setting rates for such policies, not to the adjustment of claims under the policies].)

already in contact with the DOI, were affirmatively misled into believing that such appeal was unavailable.

Failure to exhaust administrative remedies is excused if it is clear that exhaustion would be futile. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 418 [194 Cal.Rptr. 357, 668 P.2d 664].) Similarly, it is improper to invoke the primary jurisdiction of an administrative agency if it is clear that further proceedings within that agency would be futile. (See *Farmers Ins. Exchange, supra,* 2 Cal.4th at pp. 391–392 [application of primary jurisdiction doctrine not required when the policy interests underlying the doctrine would not be served].) The Joneses claim such futility with respect to the DOI remedies. We disagree. The futility exception requires that the party invoking the exception "can positively state that the [agency] has declared what its ruling will be on a particular case." (*Sea & Sage Audubon Society, Inc. v. Planning Com., supra,* at p. 418, italics omitted.) There is nothing in the record to indicate how the DOI would have decided the Joneses' case had the latter fully availed themselves of the CAARP's complaint and appeals processes.[7]

The trial court's judgment must therefore be reversed and the matter stayed pending the Insurance Commissioner's determination of the additional premium, if any, owed by the Joneses, and related issues. (See *Reiter v. Cooper* (1993) 507 U.S. 258, 268–269 [122 L.Ed.2d 604, 113 S.Ct. 1213] [proceeding to be stayed unless in the interest of justice the trial court dismisses without prejudice].) On remand, the Joneses, if they wish to continue the action, must pursue the DOI's administrative remedies to its conclusion. Like the Court of Appeal, we conclude that at this juncture, the matter should be referred to the CAARP committee, which has the specific expertise to address the premium issue, rather than to the DOI's generic complaint process, with right of appeal to the Insurance Commissioner. (See Cal. Code Regs., tit. 10, § 2495.) If the

---

[7] The Joneses contend that the CAARP grievance process failed to meet minimal due process standards because it did not authorize the taking of testimony under oath or the submission of legal briefs, and because appeal to the Insurance Commissioner did not require any type of formal hearing. The Joneses also contend that the CAARP committee was composed of a majority of members from the insurance industry, and the insurance industry would be obligated to indemnify Cal-Eagle in the event it was found liable, thereby rendering a majority of the CAARP committee financially interested in the outcome of the proceeding.

" '[I]f the [administrative] remedy provided does not itself square with the requirements of due process the exhaustion doctrine has no application.' [Citation.] Due process, though, 'does not require any particular form of notice or method of procedure. If the [administrative remedy] provides for reasonable notice and a reasonable opportunity to be heard, that is all that is required.' " (*Bockover v. Perko* (1994) 28 Cal.App.4th 479, 486 [34 Cal.Rptr.2d 423].) Nothing in the present record indicates the CAARP's grievance and appeals process was lacking in these minimal due process requirements, nor that committee members did in fact have a substantial financial incentive in finding in Cal-Eagle's favor or were otherwise biased.

Insurance Commissioner decides against the Joneses in the underlying billing dispute, then the litigation will likely come to an end. If the commissioner decides in the Joneses' favor, then the Joneses may proceed with their lawsuit, but trial will be assisted by the fact that the commissioner has made a decision on the billing dispute that is the predicate for the suit.[8]

## B. *Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing*

Because this case may be retried, we address the other issue in this case: whether the Joneses have an action in tort for breach of the covenant of good faith and fair dealing.

" 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' [Citation.] . . . Because the covenant is a contract term, however, compensation for its breach has almost always been limited to contract rather than tort remedies. As to the scope of the covenant, '[t]he precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes.' [Citation.] Initially, the concept of a duty of good faith developed in contract law as 'a kind of "safety valve" to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language.' [Citation.] As a contract concept, breach of the duty led to imposition of contract damages determined by the nature of the breach and standard contract principles." (*Foley, supra,* 47 Cal.3d at pp. 683–684.)

In the area of insurance contracts the covenant of good faith and fair dealing has taken on a particular significance, in part because of the special relationship between the insurer and the insured. "We [have] held that the insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests. The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment. [Citations.] The standard is premised on the insurer's obligation to protect the insured's interests in defending the latter against claims by an injured third party." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) A breach of this duty of

---

[8] The Joneses contend that the jury's verdict on the fraud issue alone is sufficient to support the damages award, and that the fraud verdict is not to be subject to the exhaustion of remedies requirements or the invocation of primary jurisdiction because its resolution is beyond the jurisdiction of the DOI. But both the fraud verdict and the verdict on the implied covenant of good faith and fair dealing are premised on the alleged fact that the Joneses were incorrectly billed for a retroactive premium increase. Whether that allegation is true is to be determined in the first instance by the DOI and the Insurance Commissioner.

reasonable settlement gives rise to tort damages. (*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 432–433 [58 Cal.Rptr. 13, 426 P.2d 173].)

"The implied covenant imposes obligations not only as to claims by a third party but also as to those by the insured. [Citations.] In both contexts the obligations of the insurer 'are merely two different aspects of the same duty.' [Citations.] . . . For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own." (*Egan v. Mutual of Omaha Ins. Co., supra*, 24 Cal.3d at pp. 818–819.) As in the case of failure to properly settle third party claims, " '[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' " (*Id.* at p. 818.)

In *Foley, supra*, 47 Cal.3d 654, the court refused to extend the tort of bad faith to the employment relationship, concluding that it was substantially different from the insurance relationship. In so concluding, it focused on three areas. First, when an insurer in bad faith fails to properly settle or pay a claim, "the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred. The wrongfully terminated employee, on the other hand, can (and must, in order to mitigate damages [citation]) make reasonable efforts to seek alternative employment. [Citation.] [Second], the role of the employer differs from that of the 'quasi-public' insurance company with whom individuals contract specifically in order to obtain protection from potential specified economic harm. The employer does not similarly 'sell' protection to its employees; it is not providing a public service. . . . [¶] [Third,] . . . [i]n the insurance relationship, the insurer's and insured's interest are financially at odds. . . . [¶] . . . [But] as a general rule it is to the employer's economic benefit to retain good employees. The interests of employer and employee are most frequently in alignment. If there is a job to be done, the employer must still pay someone to do it. . . . Thus the need to place disincentives on employer's conduct in addition to those already imposed by law simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context." (*Foley*, at pp. 692–693, fn. omitted; see also *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 44 [86 Cal.Rptr.2d 855, 980 P.2d 407] [refusing to extend the remedy for tortious breach to breaches of performance bonds for reasons similar to those in *Foley*].)

The question at issue is whether tort remedies should be extended to the breach of the covenant of good faith and fair dealing when the insurer has in bad faith retroactively billed an insured for an excessive premium. The Joneses argue that the factors discussed immediately above apply in such cases the insurer is compromising the availability of a public service, and the

insured will not obtain replacement insurance for a policy year partly or wholly passed. The Joneses also assert that the interest of insurers and insureds in billing disputes are adverse.

In addressing this issue, we first observe that, generally speaking, the insurer's ability to charge excessive premiums will be disciplined by competition among insurers. In the present case market forces, to be sure, are less significant, both because the premium is assessed retroactively and because the insurance program is an assigned risk plan, a public insurance program of last resort. But although the CAARP insurer is not restrained by the marketplace from overcharging premiums, premium-setting in the CAARP program is extensively regulated, and an insured faced with such an overcharge may seek administrative remedies established in place of market controls to expeditiously resolve billing disputes, as discussed above.

Aside from this observation, there are several critical factors that counsel against the availability of tort remedies for breach of the covenant of good faith and fair dealing in the present case. First, the billing dispute does not, by itself, deny the insured the benefits of the insurance policy the security against losses and third party liability. (See *Old Republic Ins. Co. v. FSR Brokerage Inc.* (2002) 80 Cal.App.4th 666, 688 [95 Cal.Rptr.2d 583].) Second, the dispute does not require the insured to prosecute the insurer in order to enforce its rights, as in the case of bad faith claims and settlement practices. (See *ibid.*)

Third, traditional tort remedies may be available to the insured who is wrongfully billed a retroactive premium. If the premium charge is wholly unjustified, the insured may, after successfully defending the action, sue for malicious prosecution. (See *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871–872 [254 Cal.Rptr. 336, 765 P.2d 498].) If the debt is reported to third parties, to the debtor's detriment, a defamation action may lie. (*Pulver v. Avco Code Financial Services* (1986) 182 Cal.App.3d 622, 638 [227 Cal.Rptr. 491]; *Schneider v. United Airlines, Inc.* (1989) 208 Cal.App.3d 71, 75 [256 Cal.Rptr. 71].) The untruthful, bad faith creditor may also be liable for intentional interference with prospective economic advantage. (See *Walsh v. Glendale Fed. Sav. & Loan Assn.* (1969) 1 Cal.App.3d 578, 588–589 [81 Cal.Rptr. 804], disapproved on other grounds in *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737–738 [108 Cal.Rptr. 845, 511 P.2d 1197].)

The Joneses contend that the very act of billing a retroactive excess premium created such financial uncertainty as to compel them to close their business. Assuming someone in a similar position to the Joneses can prove that, notwithstanding their resort to available administrative remedies, the

excessive premium charge compelled them to close their business, lost profits would be available even when the implied covenant of good faith and fair dealing sounds only in contract, so long as the lost profits were among "the natural and direct consequences of the breach." (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 457 [277 Cal.Rptr. 40] [breach of contract action permitting lost profit damages].)

The Joneses cite a number of cases in the workers' compensation insurance context in which the bad faith overbilling of a premium was held to sound in tort. Typical of these cases is *Security Officers Service, Inc. v. State Compensation Ins. Fund* (1993) 17 Cal.App.4th 887 [21 Cal.Rptr.2d 653] (*Security Officers Service*). The plaintiff employer contracted for workers' compensation insurance with the State Compensation Insurance Fund (SCIF), a public workers' compensation insurance enterprise. The premiums were calculated pursuant to a rating plan approved by the Insurance Commissioner, including an "experience rating," based on the number of outstanding claims at the end of the year and the amount of reserves that the SCIF had set aside to cover the unresolved claim. (*Id.* at p. 891.) The plaintiff alleged a breach of the implied covenant of good faith and fair dealing based on the SCIF's manipulation of the experience rating in its favor by delaying the resolution of claims and inflating the reserves, thereby permitting it to charge the plaintiff excess premiums and diminish plaintiff's dividends. (*Id.* at pp. 891–892.) The Court of Appeal affirmed that such alleged misconduct, if true, established a breach of the implied covenant of good faith and fair dealing that could give rise to tort as well as contract damages. (*Id.* at pp. 894, 899.)

*Security Officers Service* is clearly distinguishable from the present case. There, the overcharging of premiums was inextricably linked to the mishandling of claims—precisely the kind of bad faith behavior that goes to the heart of the special insurance relationship and gives rise to tort remedies.[9] The premium overbilling alleged in this case is separate from any allegations of claims mishandling.[10] Moreover, unlike the concealed mishandling of claims affecting premiums and dividends, the retroactive overbilling of a

---

[9] Other cases cited by the Joneses are similarly distinguishable. (See *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (2001) 90 Cal.App.4th 1151, 1160 [109 Cal.Rptr.2d 515]; *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 918–919 [83 Cal.Rptr.2d 89]; *Tricor California, Inc. v. State Compensation Ins. Fund* (1994) 30 Cal.App.4th 230, 239–240 [35 Cal.Rptr.2d 550].) Still other cited cases do not involve tort damages. (*MacGregor Yacht Corp. v. State Comp. Ins. Fund* (1998) 63 Cal.App.4th 448, 456–458 [74 Cal.Rptr.2d 473] [contract damages for improper claims handling and premium assessments]; *Mission Ins. Group, Inc. v. Merco Construction Engineers, Inc.* (1983) 147 Cal.App.3d 1059, 1062 [195 Cal.Rptr. 781] [equitable accounting ordered to determine how insurer calculated the dividend].)

[10] The holding thus applies only to retroactive billing cases in which the billing is separate and distinct from any allegations of claims mishandling. The Joneses contend that Cal-Eagle

premium does not require the insured to prosecute the insurer in order to vindicate its contractual rights under the insurance policy.

The Joneses also cite in support of their position *Spindle v. Travelers Ins. Companies* (1977) 66 Cal.App.3d 951, 958 [136 Cal.Rptr. 404]. In that case the Court of Appeal, in reversing the trial court's dismissal upon demurrer, affirmed the availability of tort damages for the cancellation of an insurance policy for an improper motive in order to pressure members of a doctors group to consent to a large increase in their medical malpractice premiums. We have no occasion to decide whether *Spindle* was correctly decided or whether and when the cancellation of an insurance contract for improper motives could ever give rise to tort damages. There may be circumstances in which cancellation of the policy denies the insured the benefits of the policy. (See, e.g., *Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869 [13 Cal.Rptr.2d 295] [tort damages for bad faith conduct upheld when an insurer canceled a three-year policy so as to avoid payment of claims expected to come due in the third year].) Such is not the present case.[11]

■ In sum, the Joneses were not in the same vulnerable position as those who suffer from the insurer's bad faith claims and settlement practices they were not denied the benefits of the insurance policy, were not required to prosecute the insurer to vindicate their contractual rights, and had available various administrative, contractual, and tort remedies. Accordingly, we conclude that tort remedies for breach of the implied covenant of good faith and fair dealing in this circumstance are unnecessary to protect the insured's interests and hold that no such damages are available for the Joneses' bad faith claim.

engaged in the bad faith settlement of a third party claim involving one of the Joneses' employees, but do not allege that the settlement was part of the premium billing dispute. Cal-Eagle denies any such bad faith conduct and points to the fact that the only economic damages the jury awarded was for lost profits attributable to the billing dispute. The Court of Appeal declined to address the question whether the judgment could be sustained on the bad faith handling of the claim alone because it reversed the judgment on the exhaustion of remedies/primary jurisdiction ground. We do not address this issue for the same reason.

[11] We do not decide whether an insurer who in bad faith terminates or causes the termination of an insured in an assigned risk program such as the CAARP, effectively leaving the insured without the benefits of insurance, may be liable in tort, as the Joneses appear to suggest. No such termination was alleged in this case. The Joneses did allege that the billing of an excessive premium compelled them to close their business and they obtained a favorable verdict on that issue, which must be reversed on the primary jurisdiction grounds discussed above. But the Joneses failed to fully avail themselves of administrative remedies provided by the CAARP and DOI, as discussed in the previous part of this opinion. As such, we cannot say that the alleged overbilling of the Joneses, even if proven true, amounted to a constructive termination from the assigned risk program.

### III. Disposition

The Court of Appeal reversed the judgment in favor of the Joneses and directed the trial court to direct the Joneses "to pursue to finality an administrative complaint under California Code of Regulations, title 10, section 2495." The Court of Appeal further directed the trial court to stay all proceedings "until and unless either party petitions for dissolution of the stay based on the final administrative outcome." We affirm the Court of Appeal's judgment. Further proceedings should be conducted in accord with the views expressed in this opinion. Each party is to bear its own costs on appeal.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Doi Todd, J.,* concurred.

The petition of appellant Freddie Jones and respondent Johnsey Insurance Company for a rehearing was denied October 20, 2004, and the opinion was modified to read as printed above. Baxter, J., and Werdegar, J., did not participate therein.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.