[No. C049150. Third Dist. Mar. 7, 2006.]

TILBURY CONSTRUCTORS, INC., Plaintiff and Appellant, v.
STATE COMPENSATION INSURANCE FUND, Defendant and
Respondent.

**COUNSEL**

Downey Brand, Debbie J. Vorous and Joseph S. Schofield for Plaintiff and Appellant.

Robert W. Daneri, Judith D. Sapper and Barbara Gallios for Defendant and Respondent.

**OPINION**

**ROBIE, J.**—Plaintiff Tilbury Constructors, Inc., sued its workers' compensation insurance carrier, State Compensation Insurance Fund (State Fund), asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and three other claims. Tilbury's complaint is primarily based on the contention that State Fund "performed an incompetent investigation into the responsibility for an accident suffered by one of Tilbury's employees, and, as a result, [State Fund] unreasonably settled a third-party claim for less than one-fiftieth of the value of the employee's claim. Because [State Fund] obtained almost no setoff from the responsible party, Tilbury's premiums skyrocketed." We shall conclude State Fund's conduct does not give rise to a cause of action for breach of the insurance contract or a cause of action for the tortious breach of the covenant

of good faith and fair dealing. We shall affirm the judgment dismissing the action after the trial court sustained State Fund's demurrer without leave to amend.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Our review of the trial court's actions in sustaining State Fund's demurrer without leave to amend is governed by well-settled principles. " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171], quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Our review of the legal sufficiency of the complaint is de novo, "i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. [Citation.]" (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].)

Applying this standard of review here, Tilbury's complaint alleges the following:

Tilbury entered into an insurance contract for workers' compensation insurance with State Fund on April 1, 2000.

In September 2000, Tilbury was working on the expansion of California Dairies Inc.'s facilities in Turlock, California. Tilbury worked as a subcontractor for Golden State Steel Company, Inc., which in turn was a subcontractor to the general contractor on the project, Harris Company, Inc.

Most of Tilbury's work took place in the creamery silo. Harris employees ordered Tilbury employees not to use Tilbury ladders in the silo. In fact, a

---

[1] We deny State Fund's request that we take judicial notice of two documents from the Workers' Compensation Appeals Board as they are irrelevant to our disposition. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

Harris employee installed its own portable metal extension ladder in the silo to provide access to the catwalk inside the silo. The Harris employee, however, failed to properly secure that ladder.

On September 25, 2000, Gary Alfrey, one of Tilbury's employees, was working in the silo. A Harris employee directed Alfrey to climb to the catwalk and erect a safety line. Alfrey used Harris's ladder to ascend to the catwalk when the ladder slipped out from under him and he fell 12 feet to the ground. Alfrey suffered severe injuries to his right leg and foot. His foot will never completely heal.

The California Department of Industrial Relations, Division of Occupational Safety and Health issued a citation to Tilbury for violating worker safety rules regarding unsecured ladders. Subsequently, that citation was deleted by the department for lack of evidence.

Alfrey sued Harris for his injuries. During that litigation, the Harris employee who placed the ladder and failed to secure it testified in his deposition that the ladder was not in place prior to the accident nor did he enter the silo in the days immediately prior to the accident. At trial, the employee recanted this testimony and claimed that he had lied during his deposition to avoid being blamed for the accident.

State Fund paid out workers' compensation benefits to Alfrey in the amount of $219,387.90 and estimated his compensable future losses would amount to $282,512. State Fund has subrogation rights under the law and its policy is to recover these sums from third parties who caused the accident. State Fund investigated whether to pursue subrogation and ultimately decided to pursue a subrogation claim against Harris.

Ten days prior to the scheduled trial date, State Fund sold its subrogation rights to Harris for $10,000. Tilbury alleges that State Fund relied on three documents in its decision to settle the action: (1) a notice from the Division of Occupational Safety and Health that it decided not to cite Harris; (2) a citation against Tilbury for violation of the regulation requiring ladders to be safely secured (the primary charge in this citation had been deleted nine months prior); and (3) a mediation brief submitted by Harris's attorneys to the superior court. Tilbury alleged that State Fund failed to take any steps to determine that the Occupational Safety and Health Appeals Board had deleted the accident-related determination in the citation issued against Tilbury. Before settling its subrogation claim with Harris, State Fund did not speak with any employees of Tilbury, including Alfrey, Tilbury's general manager, or any employees on the job site the day of the accident. Further, State Fund

did not obtain any of the documents filed by Alfrey's attorneys in the action. State Fund did not inform Tilbury of its decision to sell the lien to Harris until 30 days later.

At trial, Harris settled Alfrey's legal claims against it for $1.2 million. To date, State Fund has paid and held in reserve at least $522,894 on behalf of Alfrey and received only $10,000 as an offset of that amount.

Tilbury's workers' compensation premiums are affected by its experience modification rating. Tilbury alleges as a result of State Fund's conduct of failing to investigate and obtain a fair settlement from Harris, Tilbury's experience modification factor has increased. In turn, its workers' compensation insurance premiums have increased in the amount of $42,000 for the year April 1, 2002, through April 1, 2003, and will increase in an unknown amount in the following year. Other employers will also suffer an increase in premium periods as well. The increase in Tilbury's workers' compensation premiums has also forced Tilbury to raise its bidding rates and caused it to lose business opportunities and profits.

Tilbury alleges that State Fund has sought to obtain a credit against its obligations to pay Alfrey's benefits based on the $1.2 million settlement. The net effect of this application will be to reduce State Fund's out-of-pocket expenses, but will provide Tilbury with no relief from its increased premiums. In that application for credit, State Fund has taken the position that there was no finding that Tilbury had any fault in the accident.

Tilbury further alleges that State Fund failed to provide it with documentation of its subrogation handling for three months after Tilbury's request. State Fund further refused to discuss altering any of Tilbury's premiums.

Based on these allegations, Tilbury sued State Fund for breach of the insurance contract, breach of the covenant of good faith and fair dealing, violation of Business and Professions Code section 17200, interference with prospective economic advantage, and unjust enrichment. In short, Tilbury claims State Fund failed to properly investigate its subrogation claim and based on its failure to investigate, settled the claim for an unreasonably low amount.

State Fund filed a demurrer to the complaint. The trial court sustained that demurrer without leave to amend and entered judgment in favor of State Fund. Tilbury appeals.

## DISCUSSION

### I

### *Tilbury Has Not Alleged an Actionable Breach of the Covenant of Good Faith and Fair Dealing*

Tilbury argues the trial court erred in dismissing its cause of action for tortious breach of the covenant of good faith and fair dealing. Tilbury contends this tort "is available to prevent the insurer from taking unreasonable actions that will increase future premiums." While this rule holds true in some circumstances, it does not apply here.

■ "Every contract imposes on each party an implied duty of good faith and fair dealing. [Citation.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' [Citations.] Or, to put it another way, the 'implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' [Citations.] A ' "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself," and it has been held that " '[b]ad faith implies unfair dealing rather than mistaken judgment. . . .' [Citation.]" [Citation.]' [Citation.] For example, in the context of the insurance contract, it has been held that the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim ' "is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities." [Citation.]' [Citation.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345–346 [108 Cal.Rptr.2d 776].)

■ "Insurance contracts are unique in nature and purpose. [Citation.] An insured does not enter an insurance contract seeking profit, but instead seeks security and peace of mind through protection against calamity. [Citation.] The bargained-for peace of mind comes from the assurance that the insured will receive prompt payment of money in times of need. [Citation.] Because peace of mind and security are the principal benefits for the insured, the courts have imposed special obligations, consonant with these special purposes, seeking to encourage insurers promptly to process and pay claims. Thus, an insurer must investigate claims thoroughly [citation]; it may not deny coverage based on either unduly restrictive policy interpretations [citation] or standards known to be improper [citation]; it may not unreasonably delay in processing or paying claims [citation]." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148 [271 Cal.Rptr. 246].) "These special duties,

at least to the extent breaches thereof give rise to tort liability, find no counterpart in the obligations owed by parties to ordinary commercial contracts. The rationale for the difference in obligations is apparent. If an insurer were free of such special duties and could deny or delay payment of clearly owed debts with impunity, the insured would be deprived of the precise benefit the contract was designed to secure (i.e., peace of mind) and would suffer the precise harm (i.e., lack of funds in times of crisis) the contract was designed to prevent. [Citation.] To avoid or discourage conduct which would thus frustrate realization of the contract's principal benefit (i.e., peace of mind), special and heightened implied duties of good faith are imposed on insurers and made enforceable in tort. While these 'special' duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because an insurer is a fiduciary." (*Ibid.*)

In *Love*, the insureds sought to estop the insurance company from asserting the statute of limitations because the insurance company had an obligation to disclose that an excluded loss was a covered loss under certain circumstances. (*Love v. Fire Ins. Exchange, supra*, 221 Cal.App.3d at p. 1144.) The insureds claimed this duty arose out of the fact that the insurance company owed the insureds a fiduciary duty to disclose this legal argument that would provide them with coverage. (*Ibid.*) In rejecting this argument, the *Love* court noted, "because of the 'special relationship' inherent in the unique nature of an insurance contract, the insurer's obligations attendant to its duty of good faith are heightened. Such obligations have been characterized as *akin* to fiduciary-type responsibilities. [Citation.] Because of this unique 'special relationship,' a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies. [Citation.]" (*Id.* at p. 1147.) The court continued, "However, the California Supreme Court has never squarely held that an insurer is a *true* fiduciary to its insured." (*Ibid.*) The court pointed out that "[u]nique obligations are imposed upon true fiduciaries which are not found in the insurance relationship. For example, a true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. [Citation.] An insurer, however, may give its own interests consideration equal to that it gives the interests of its insured [citation]; it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims [citation]; and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured [citation]." (*Id.* at pp. 1148–1149.) In discussing the covenant of good faith and fair dealing, the *Love* court held, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." (*Id.* at p. 1151.)

■ State Fund relies on *New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088 [9 Cal.Rptr.2d 469]. There, the court was called upon to decide "whether an employer who has assigned its subrogation rights to its workers' compensation insurance carrier has a cause of action against the carrier for negligence or breach of the implied covenant of good faith and fair dealing when the carrier does not actively pursue those subrogation rights." (*Id.* at p. 1091.) The court concluded the insured employer had no cause of action. (*Ibid.*) In *New Plumbing,* the employer alleged that its workers' compensation carrier failed to properly investigate or pursue its subrogation rights and as a result the employer lost the opportunity to have its experience modification reduced and receive a refund of premiums for several years. (*Id.* at p. 1092.) The court first examined the insured employer's causes of action for negligence and the breach of the covenant of good faith and fair dealing. (*Id.* at p. 1093.) In that examination, the court concluded that the insurance carrier had no duty to diligently pursue its subrogation rights. (*Ibid.*) The court explained that under the workers' compensation statutes, an insurance carrier has three statutory options to assert its right to subrogation. (*Ibid.*) First, it can file suit against the third party in its own name. (Lab. Code, §§ 3850, 3852.) Second, it may intervene in an action filed by the employee against the third party. (Lab. Code, § 3853.) Third, the insurer can take no action, but instead claim a lien against any judgment recovered by the employee. (Lab. Code, § 3856, subd. (b).) The *New Plumbing* court concluded that requiring the carrier to choose the method that was most favorable to its insured would vitiate the choices presented by the statutory scheme because the carrier would always have to file an action on its own behalf. (*New Plumbing Contractors,* at p. 1094.) The court stated, "Rather than impose a duty on the carrier to proceed in a specific manner, the statutory scheme gives the carrier its choice of proceeding in any manner. Furthermore, because subrogation is a right, not an obligation, the insurer presumably has the option of not pursuing subrogation recovery at all. Likely, this is often the case when the amount of benefits are relatively small and it would be economically unreasonable to pursue subrogation." (*Id.* at p. 1095.)

■ The *New Plumbing* court also separately examined the insured employer's cause of action for breach of the covenant of good faith and fair dealing. The court stated, "neither the duty nor the covenant of good faith and fair dealing extends beyond the terms of the insurance contract in force between the parties." (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co., supra,* 7 Cal.App.4th at p. 1096.) The insurance contract between Nationwide and New Plumbing provided that " 'We [Nationwide] have your rights, and the rights of persons entitled to the benefits of this insurance to recover our payments from anyone liable for the injury. You [New Plumbing] will do everything necessary to protect those rights for us and to help us enforce them.' " (*Id.* at pp. 1091–1092.) Thus, the "carrier's decision regarding

pursuing its subrogation rights after it has properly paid claims under the insurance policy does not affect the insured's receiving the benefits of the insurance agreement." (*Id.* at p. 1096.) The court concluded that because the insurance carrier had paid the claim for which the employer was insured and there were no allegations of impropriety in the carrier's claims handling, the subsequent increase in premiums did not deny the employer of any benefits under the policy. (*Ibid.*) Rather, this act implicated the marketplace aspect of the relationship between the insured and its insurance carrier. (*Id.* at p. 1097.)

■ Here, the insurance contract provides, "We may enforce your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them." As demonstrated by *New Plumbing,* State Fund's right to obtain subrogation under this provision, and under the relevant Labor Code provisions is just that, a right. Tilbury has alleged no defalcations in the manner in which State Fund handled the claim, paid out the benefits, or dealt with the claims handling portion of the case. The right of subrogation is not a duty under the contract, nor can it be transformed into a duty by virtue of tort law. Thus, because the decision of how and when it shall pursue subrogation, including the decision not to pursue subrogation at all, is State Fund's right. Tilbury cannot state a cause of action for tortious breach of the covenant of good faith and fair dealing based on State Fund's alleged failure to diligently and properly pursue its own right.

■ Tilbury further argues the insured employer has an interest in third party recoveries because Insurance Code section 11751.8 provides, in relevant part: "An insurer shall report to its rating organization as corrections or revisions of losses, pursuant to the unit statistical plan and uniform experience rating plans approved by the commissioner, if any of the following is applicable: [¶] . . . [¶] (c) The carrier has recovered in an action against a third party." This provision, however, does not require the carrier to pursue its subrogation rights, nor does it impose any duty on the carrier that runs contrary to the four separate options it is entitled to chose from when deciding whether and how to exercise its own subrogation rights.

Our conclusion is further buttressed by *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917 [16 Cal.Rptr.3d 849, 94 P.3d 1055]. There, our Supreme Court declined to extend the tort remedies for the breach of the covenant of good faith and fair dealing to claims the insurance company retroactively and in bad faith billed its insured for increased premiums. (*Id.* at pp. 938, 941.) In *Jonathan Neil,* the insureds defended a collection action against them for the failure to pay insurance premiums and filed a cross-complaint against the insurance company for breach of the covenant of

good faith and fair dealing when the insurance company "retroactively and knowingly charged [them] a substantially higher premium than was actually owed." (*Id.* at p. 923.) The Supreme Court explained that it had previously declined to extend the tort of the breach of the covenant of good faith and fair dealing to the employer-employee relationship for three major reasons. (*Id.* at p. 938.) First, when an insurance company fails to settle or pay a claim, the insured cannot turn to the marketplace to find another insurance company willing to pay that claim, while an employer can always find a new employee. (*Ibid.*) Second, the role of an employer is different from the "quasi public" role of the insurance company with whom policyholders specifically contract to obtain protection from specific economic harm. (*Ibid.*) Third, in the insurance context, the insurer and insured's interests are financially at odds, while in the employment context, the employer and the employee are presumably looking toward the same goal. (*Ibid.*) The court concluded that an insurance company's ability to charge excessive premiums will be disciplined by the marketplace by competition among insurers. (*Id.* at p. 939.) In addition, the court concluded three other factors counseled against the extension of tort liability to this postclaim practice. (*Ibid.*) First, the billing dispute, by itself, did not "deny the insured the benefits of the insurance policy the security against losses and third party liability." (*Ibid.*) Second, the "dispute [did] not require the insured to prosecute the insurer in order to enforce its rights, as is the case of bad faith claims and settlement practices." (*Ibid.*) And, third, "traditional tort remedies may be available to the insured who is wrongfully billed a retroactive premium," such as a malicious prosecution action, or a defamation action, or intentional interference with contract action. (*Ibid.*)

Similarly, here, most of the factors *Jonathan Neil* relies upon persuade us that Tilbury has not stated a claim.[2] First, and most importantly, State Fund has not denied Tilbury any benefits due to Tilbury under the insurance policy. None of its actions arise out of its conduct in fulfilling its obligations of defending, investigating, reserving, and settling claims. There are no allegations in the complaint that State Fund improperly handled the underlying claim in any manner. There are no allegations that State Fund failed to investigate the claim, delayed payment of the claim, or failed to defend and indemnify Tilbury. Thus, the subrogation failures did not deny Tilbury any benefits under the policy.

Second, State Fund's alleged failures did not require Tilbury to sue to enforce its rights to benefits under the policy.

---

[2] Obviously, State Fund is acting in a quasi-public role in providing insurance, and it appears that no other traditional tort remedies exist to redress the impact of increased premiums.

Third, to the extent that Tilbury is dissatisfied with State Fund's subrogation record, they can go out into the market and purchase workers' compensation insurance from a separate carrier in future years. While its premiums may be higher in the first years after obtaining a new carrier, Tilbury will be able to reap the benefit of an insurer who pursues subrogation in a manner closer to Tilbury's liking in the market.

Fourth, State Fund's and Tilbury's interests are not at odds in the context of subrogation, but rather are closely aligned. Both insurer and insured desire to recover as much as possible: State Fund to reduce its losses and Tilbury to reduce its premiums. Thus, it is not within State Fund's interests to do a poor job of investigating and pursuing subrogation claims.

■ Tilbury also argues that a series of cases starting with *Security Officers Service, Inc. v. State Compensation Ins. Fund* (1993) 17 Cal.App.4th 887 [21 Cal.Rptr.2d 653] (*Security Officers*),[3] stand for the proposition that when an insurance carrier discharges a discretionary function in bad faith and in a manner that impacts the premiums paid by the insured, then the tort of breach of the implied covenant of good faith and fair dealing will lie. This is true when the conduct arises out of claims handling practices. It does not apply to the carrier's right of subrogation.

In *Security Officers,* the plaintiff insured sued State Fund for its systematic failure to process claims diligently and its unreasonable inflation of the reserves assigned to those claims. (*Security Officers, supra,* 17 Cal.App.4th at pp. 889–890.) State Fund's bad faith delaying the resolution of claims and inflating its reserves operated to inflate the experience rating factor of its insured and permitted State Fund to charge excess premiums and pay less in dividends. (*Id.* at pp. 891–892.) The appellate court explained that this conduct, if true, established a breach of the implied covenant of good faith and fair dealing that gave rise to tort and contract damages. (*Id.* at pp. 894, 899.) Specifically, *Security Officers* held, "[w]e therefore conclude, in light of all of the authorities heretofore discussed, that the policy's implied covenant of good faith and fair dealing required [State Fund] to conduct its functions of defending, investigating, reserving, and settling claims with good faith regard for their effect upon plaintiff's premiums, as determined under the policy and governing regulations." (*Id.* at p. 898.)

We reject Tilbury's proffer of these cases for the same reasons that *Jonathan Neil* rejected their application to the postclaim billing of premiums.

---

[3] See also *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911 [83 Cal.Rptr.2d 89]; *MacGregor Yacht Corp. v. State Comp. Ins. Fund* (1998) 63 Cal.App.4th 448 [74 Cal.Rptr.2d 473]; *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194 [51 Cal.Rptr.2d 622]; *Tricor California, Inc. v. State Compensation Ins. Fund* (1994) 30 Cal.App.4th 230 [35 Cal.Rptr.2d 550].

(*Jonathan Neil & Assoc. v. Jones, supra,* 33 Cal.4th at pp. 940–941.) As the court noted, in each of those cases, "the overcharging of premiums was inextricably linked to the mishandling of claims—precisely the kind of bad faith behavior that goes to the heart of the special insurance relationship and gives rise to tort remedies. The premium overbilling alleged in this case is separate from any allegations of claims mishandling." (*Id.* at p. 940, fn. omitted.) The same holds true here. It is not simply the increase in premium that gives rise to the tortious breach of the covenant of good faith and fair dealing. Rather, it is the underlying conduct that arises out of the insurance company's duties to defend, investigate, reserve, and settle claims that gives rise to the tort. State Fund's subrogation rights are independent and separate from those duties under the policy. Thus, the cases addressing the obligations of an insurer in the execution of its duties under the policy do not apply to its subrogation right.

The trial court, thus, properly sustained the demurrer without leave to amend as to this cause of action.

## II

### *Tilbury Has Not Alleged an Actionable Breach of Contract*

In addressing its cause of action for breach of contract, Tilbury argues, "the Courts of Appeal have repeatedly and consistently recognized that an employer has a remedy at law when its workers' compensation insurance carrier takes an unreasonable discretionary action that increases the employer's future premiums." In support of this position, Tilbury cites *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (2001) 90 Cal.App.4th 1151 [109 Cal.Rptr.2d 515] (*Lance Camper II*); *Notrica v. State Comp. Ins. Fund, supra,* 70 Cal.App.4th 911; *MacGregor Yacht Corp. v. State Comp. Ins. Fund, supra,* 63 Cal.App.4th 448; *Tricor California, Inc. v. State Compensation Ins. Fund, supra,* 30 Cal.App.4th 230; *Security Officers, supra,* 17 Cal.App.4th 887. We reject this argument.

A closer examination of these cases reveals that it is not the discretionary nature of the actions of the insurance company that gives rise to liability, but rather the fact that these actions take place in the context of the primary duties of the insurance company under the policy. In each of the cases mentioned *ante,* the insured employer's claim of breach of contract related to how the insurance company handled claims asserted against its insured. In *Lance Camper II,* 90 Cal.App.4th at pages 1155–1156, the insured claimed the insurance company inflated the reserves in bad faith. In *Notrica v. State Comp. Ins. Fund, supra,* 70 Cal.App.4th at page 918, the insured based its claims against State Fund on its reserve and claims handling policies and practices. In

*Tricor California, Inc. v. State Compensation Ins. Fund, supra,* 30 Cal.App.4th at page 238, the insured claimed the insurer failed to adequately and promptly investigate claims, failed to pay only legitimate claims, failed to permit the insured to review claims files, and failed to accurately set premiums and dividend rates. In *MacGregor Yacht Corp. v. State Comp. Ins. Fund, supra,* 63 Cal.App.4th at page 455, the insured asserted that the insurer failed to investigate, defend, or settle claims properly. Finally, in *Security Officers, supra,* 17 Cal.App.4th at page 891, the insured alleged that State Fund failed to pay benefits promptly and failed to set reserves at reasonable levels, and that its sloth in resolving claims constituted a breach of State Fund's duty to defend and resolve claims in a diligent fashion.

    Against this backdrop, where the core duties of the insurance company under its insurance contract are at issue, these courts have concluded, "an insurer's pattern of failing to pay claims promptly, defend them diligently, or assign them reasonable reserves, followed by improperly failing to pay dividends to the insured, may constitute breach of the express and implied contractual terms in a workers' compensation insurance policy." (*Lance Camper II,* 90 Cal.App.4th at p. 1155.) Thus, a " 'failure to reasonably evaluate claims prior to setting reserves, inadequate monitoring of claims by the insurer, failure to minimize claims, failure to communicate with the insured, hiring of inadequate and incompetent legal and medical counsel, [and] unnecessary delays in closing claims' constitute claims handling practices that are actionable." (*Ibid.*) Each of these cases expressly focuses on the claims handling actions of the insurer. This is not surprising because this is the obligation of the insurer under the express language of the policy.

    Here, for example, State Fund's policy obligates it to "promptly pay when due to those eligible under this policy the benefits required of [Tilbury] by the workers' compensation law." The policy also provides that State Fund has the "duty to defend at our expense any claims or proceedings against [Tilbury] . . . ." It is precisely because these paragraphs of the policy impose affirmative duties on State Fund for the benefit of the insured that the contract and the *contractual* implied covenant of good faith and fair dealing require State Fund to undertake and perform these actions in good faith. It is for this same reason that State Fund is liable for contractual damages when it fails to meet this standard of good faith in the execution of these duties. The complaint before us does not allege any improprieties in these actions.

    By contrast, in the context of subrogation, the policy provides that State Fund "*may* enforce [Tilbury's] rights, and the rights of persons entitled to the benefits of this insurance, to recover [State Fund's] payments from anyone liable for the injury." This subrogation right inures to the benefit of State Fund. It is written with the word "may" indicating of the permissive nature of

the right State Fund enjoys under the policy, and under the Labor Code. (See *New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co., supra,* 7 Cal.App.4th at p. 1093 [the insured may choose from four options, including not pursuing subrogation at all].) Thus, State Fund's determination to exercise its right of subrogation in either good or bad faith is not actionable as a breach of the insurance contract's express terms or the covenant of good faith and fair dealing. The trial court did not err in concluding otherwise and properly sustained the demurrer without leave to amend.

## III

### *Tilbury Has Failed to Preserve Its Arguments As to Other Potential Claims*

In a single sentence in its opening brief contained within its arguments about the covenant of good faith and fair dealing, Tilbury states: "Tilbury also has viable tort claims for unjust enrichment, interference with prospective economic advantage, and violations of Business and Professions Code sections 17200 *et seq.* (unfair competition law), all of which provide a proper basis for suit when the offending party breaches its contractual or statutory duty to another and thereby causes injury." It further cites three cases without any discussion of their application to this case. We shall disregard these legal contentions. First, "[e]ach point in an appellate brief should appear under a separate heading, and we need not address contentions not properly briefed. [Citations.]" (*Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345–1346 & fn. 17 [101 Cal.Rptr.2d 591]; see *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 [98 Cal.Rptr.2d 894] ["an argument raised in such perfunctory fashion is [forfeited]"]; Cal. Rules of Court, rule 14(a)(1)(B) [an appellate brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument"].) Further, Tilbury has failed to provide any adequate legal analysis in its opening brief of these several causes of action and the potentially complex legal analysis necessary to determine whether it has stated a cause of action under any of these theories. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521] ["To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis"]; *People v. Harper, supra,* 82 Cal.App.4th at p. 1419, fn. 4.)

## DISPOSITION

The judgment is affirmed. State Fund shall recover its costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Sims, Acting P. J., and Hull, J., concurred.