Filed 7/26/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B328627 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. YA004627 |
| v. | |
| HARRY D. MALBRY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hector M. Guzman, Judge. Affirmed.

Richard B. Lennon and Peter Westacott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Attorney General and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

Harry Malbry wants to stop registering as a sex offender. He has this duty because, in 1991, he pleaded no contest to a charge of a lewd act on a child. He penetrated an unrelated five year old girl who called him "Daddy." He repeated this conduct on a daily basis during the work week, while the girl's mother was away at her job. He persisted for three years until the girl eventually told her mother, after she turned eight. Malbry was convicted, imprisoned for a six-year term, released, and required to register annually as a sex offender. In 2022, Malbry petitioned the trial court to terminate his registration duty, arguing his crime-free record since 1991 showed he is no longer a danger to the community.

The trial court correctly denied Malbry's petition. "[C]ommunity safety would be significantly enhanced by requiring continued registration." (Pen. Code, § 290.5, subd. (a)(3).) The persistence and extent of Malbry's offense conduct, his lack of insight, and his willingness to exploit a trusting child support the trial court's ruling. Undesignated citations are to the Penal Code.

I

The victim testified at a preliminary hearing in 1991, when she was eight years old. She knew the difference between telling the truth and telling a lie. If she told a lie, she testified, she would be punished: "No TV, no juices, no going outside, no going to birthday parties, you know, not having fun stuff." Malbry did not object to the competence of this eight-year-old witness. (See Evid. Code, §§ 700, 701, subd. (a)(2).)

The girl was alone in the house with Malbry when she came home from school during the work week.

"[W]hen my mom was at work, I would be sitting in my room, sometimes I would be sitting in the living room, and he would call me in his bedroom . . . ."

Malbry would "unzip his pants" and "pull out his private . . . ." His "private" was "that part in front" where men go "to the bathroom."

"He would pull my panties over like this."

"[H]e made me sit on his lap . . . ."

His "private" touched the "inside and outside" of the girl's "private." Her "private" was "[w]hat I sit on." The court noted she "pointed to her vaginal area."

The girl told police she could feel his "private parts" inside her "private parts."

The girl said Malbry would pant like a dog. She made a panting sound to demonstrate.

"He would go run to the bathroom, and right before[,] the stuff would be falling on the floor . . . ."

Afterward he told her, "If you tell anyone, I am going to do something bad to your mom."

The girl testified that, the first time this happened, she was "[f]our or five" years old.

After the first time, it happened *every day* her mother was working.

It did not happen on weekends because "my mom was off on the weekends" and was home then.

When she was eight years old, in 1990, the girl told her mother something was happening.

The mother contacted authorities. She and her daughter cut contact with Malbry.

Prosecutors charged Malbry with a six-count information: five counts of a lewd act on a child (§ 288, subd. (a)) and one count of continuous sexual abuse of a child (§ 288.5). In each count, the information accused Malbry of "penetration of vagina of victim by the penis of said defendant." Each count contained a notice: "Conviction of this offense will require you to register pursuant to Penal Code section 290. Willful failure to register is a crime."

In 1991, Malbry pleaded no contest to one count of lewd act on a child. He checked a box about registering as a sex offender under section 290 as part of his plea.

The prosecution agreed to a six-year prison term and moved to dismiss the other five counts. Malbry was incarcerated and released. He registered annually as a sex offender.

In 2022, represented by counsel, Malbry petitioned to terminate his sex offender registration obligation. His petition asserted he was a tier two offender eligible for termination because he had registered for at least 20 years. (See §§ 290, subd. (d)(2) ["A tier two offender is subject to registration for a minimum of 20 years. A person is a tier two offender if the person was convicted of an offense described in subdivision (c) . . . ."], 290, subd. (c)(1) [listing § 288, which was Malbry's offense of conviction].)

We describe this three-tier system later, but first we complete our procedural overview.

The prosecution opposed Malbry's petition. Prosecutors urged the court to deny Malbry's petition, even though they agreed convictions under subdivision (a) of section 288, like Malbry's, indeed were tier two offenses. Malbry thus was "technically eligible" to apply for termination. But they argued

4

section 288 covered a wide range of conduct, and, while some acts could be less serious, other conduct was highly dangerous. The "egregious" facts of Malbry's case were "more aggravated." Malbry "took advantage of a position of trust as the victim's 'daddy.'" Moreover, they argued, a single violation of section 288.7, which was enacted in 2006–after Malbry's conviction–covered Malbry's conduct and mandated *lifetime* registration, which showed Malbry posed a significant danger to the community.

Malbry responded with a legal brief and four pieces of evidence. This evidence was, first, a one-page letter from Malbry's sister-in-law of 25 years. This relative expressed her and her family's support for Malbry, whom she described as "an outstanding citizen in a very upscale neighborhood . . . He is a church going man, [and] he has donated toys and gifts to children [in] hospitals for years with his wife . . . ." A second document was a photocopy of Malbry's business card for a carpet cleaning company. Third, a one-page letter from a couple living across the street described Malbry as a "fantastic neighbor" and a "model neighbor" who, for 20 years, had taken out their garbage when they needed it and had demonstrated traits of a good neighbor and a good citizen. Fourth, Malbry's wife, who was not the girl's mother, wrote a one-page letter confined to reporting how Malbry had helped her pass out supplies to homeless people on two or three days during a year.

Malbry himself offered no declaration or statement.

The trial court's hearing transcript extended for some 40 pages. There was no live testimony; the hearing consisted entirely of counsel discussing the case with the court.

The court concluded Malbry's "risk, in my opinion, based on the information that I have in front of me and my own years of handling cases similar to this is that the risk of re-offense is extremely elevated. In part, the registration, having a person register has a beneficial effect in that it hopefully impresses upon the individual that is registered that he is being watched, he is being monitored, and that that in a way has a deterrent effect on the individual . . . [T]here is some deterrent element to registering . . . in addition to giving the community notice of a potential risk."

Malbry appealed the court's denial of his petition.

II

The trial court rightly denied Malbry's petition because continuing his registration as a sex offender significantly enhances community safety.

A

"The Legislature has long demonstrated a strong resolve to protect children from sexually inappropriate conduct of all kinds, including sexual intercourse and oral copulation. [. . .] [C]onviction of a sexual contact crime may subject the offender to incarceration, civil penalties, and other consequences. One of the significant consequences includes application of the Sex Offender Registration Act, which was enacted to prevent recidivism of sex offenders and facilitate their surveillance by police." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 874 (*Johnson*), citation and footnote omitted.)

In 1947, California became the first state to require sex offenders to register with law enforcement. (Off. of the Atty. Gen., *California Sex Offender Registry* (2024) State of Cal. Dept. of J. <https://oag.ca.gov/sex-offender-reg> (as of July 23, 2024),

6

archived at https://perma.cc/CX3C-FHYW.)  As originally enacted, the statute created a lifelong obligation to register annually.  (*Johnson, supra,* 60 Cal.4th at p. 877.)

A central goal of sex offender registration is to prevent recidivism in sex offenders.  This serves a "vital public purpose by compelling registration of many serious and violent sex offenders who require continued public surveillance."  (*Johnson, supra,* 60 Cal.4th at p. 877.)

Children in particular "require paramount protection" from sex offenders.  (*Johnson, supra,* 60 Cal.4th at p. 877.)

"[M]andating lifetime registration of those who prey on underage victims serves to notify members of the public of the existence and location of sex offenders so they can take protective measures."  (*Johnson, supra,* 60 Cal.4th at p. 877, quotation marks and citation omitted.)

Registration is not punishment for a crime.  It is a nonpunitive civil mechanism to protect the public from danger.  (*Smith v. Doe* (2003) 538 U.S. 84, 93, 96, 105–106; *People v. Mosley* (2015) 60 Cal.4th 1044, 1050.)  "Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record."  (*Smith v. Doe*, *supra*, at p. 101.)

In 1996, Megan's Law amended California's sex offender registration system.  (*Fredenburg v. City of Fremont* (2004) 119 Cal.App.4th 408, 412 & fn. 1 (*Fredenburg*); see §§ 290.4, 290.45; see also *Smith v. Doe, supra*, 538 U.S. at pp. 89–91 [background on Megan's Law].)

When enacting Megan's Law, the California Legislature declared sex offenders pose a high risk of engaging in further offenses after release. Protecting the public from these offenders is a paramount public interest. Members of the public have a compelling and necessary interest in getting information about released sex offenders to protect themselves and their children. (*Fredenburg, supra,* 119 Cal.App.4th at p. 412.)

Released sex offenders have a reduced expectation of privacy. The Legislature balanced the offenders' rights against the interests of public security and concluded that disclosing some information about sex offenders would further the primary government interest of protecting vulnerable populations from harm. (*Fredenburg, supra,* 119 Cal.App.4th at p. 412.)

Megan's Law provided for the collection and limited disclosure of information about sex offenders who were required to register by section 290. (*Fredenburg, supra,* 119 Cal.App.4th at pp. 413–414.) Law enforcement could inform people or organizations the offender was likely to encounter, including schools, day care centers, and community members at risk. (*Id.* at p. 416.) Information about registered sex offenders is available online. (See Off. of the Atty. Gen., *California Megan's Law Website* (2024) State of Cal. Dept. of J. <https://www.meganslaw.ca.gov/> [as of July 23, 2024], archived at <https://perma.cc/73WS-LDDS>.)

In 2014, a state agency called the California Sex Offender Management Board recommended reforms to this sex offender registration system. (Cal. Sex Offender Management Bd., *A Better Path to Community Safety*, p. 7 (2014) <https://casomb.org/docs/Tiering%20Background%20Paper%20FINAL%20FINAL%204-2-14.pdf> [as of July 23, 2024], archived at <https://perma.cc/

9JBJ-J6KH> [Tiering Paper].)

The Board noted research showed "a registry can help law enforcement apprehend the perpetrator more quickly." (Tiering Paper, *supra*, p. 2.)

The Board proposed streamlining to make the system more effective. California's undifferentiated list of sex offenders had grown so large as to imperil its usefulness to law enforcement. The state had been collecting registration information for more than 60 years. Many crimes triggered registration. Together with California's large population, these forces meant that, over time, the number of names on the sex offender registry had become unwieldy. By 2014, the state list of sex offenders numbered some 100,000 people—the largest in the nation by a significant margin. (Tiering Paper*, supra*, pp. 3-6; see also Cal. Sex Offender Management Bd., *Recommendations Report*, p. 50 (January 2010) <https://casomb.org/docs/CASOMB%20Report% 20Jan%202010_Final%20Report.pdf> [as of July 23, 2024], archived at <https://perma.cc/L66V-MDGV>.)

The one-size-fits-all nature of the list unrealistically equated the danger posed by all sex offenders, when in fact "[n]ot all sex offenders are at equal risk to reoffend. Low risk offenders reoffend at low rates, high risk offenders at much higher rates." (Tiering Paper, *supra*, p. 4.) "When everyone [on the list] is viewed as posing a significant risk, the ability for law enforcement and the community to differentiate between who is truly high risk and more likely to reoffend becomes impossible. There needs to be a way for all persons to distinguish between sex offenders who require increased monitoring, attention and resources and those who are unlikely to reoffend." (*Id.* at p. 6.)

The Board recommended overhauling the state's registration system so that "the length and level of registration matches the risk level of the offender." (Tiering Paper, *supra*, p. 7.)

The Legislature responded with a 2017 law called Senate Bill 384. (Stats. 2017, ch. 541, § 12, p. 31, eff. Jan. 1, 2018, operative July 1, 2021 (S.B. 384).)

S.B. 384 enjoyed widespread law enforcement support and no reported opposition. (Daniel Seeman, Enrolled Bill Memorandum to Governor Edmund G. Brown re Sen. Bill No. 384 (2017-2018 Reg. Sess.), Sept. 22, 2017, p. 1.)

S.B. 384's author wrote that California's system of requiring lifetime registration for many sex crimes, some of which were relatively nonserious, had resulted in a registration list "so bloated" that "law enforcement cannot effectively use it." (Sen. Wiener, sponsor of S.B. 384, letter to Governor Jerry Brown, Sep. 16, 2017).

The Los Angeles County District Attorney's Office was a sponsor of S.B. 384. That office urged the Governor to sign the bill. (District Attorney Jackie Lacey, letter to Governor Jerry Brown, re S.B. 384, Sep. 27. 2017 (Lacey letter).) "California urgently needs a new sex offender registration system that focuses attention and resources on high risk and violent sex offenders. [¶] The list of mandatory registration offenses . . . includes relatively nonserious offenses, such as indecent exposure . . . ." (*Id.* at p. 1.) "[B]ecause of the size of California's Sex Offender Registry, it has lost much of its value as an investigatory tool." (*Id.* at p. 2.)

S.B. 384 would "abolish" the current mandatory lifetime registration and replace it with three tiers reflecting the

10

seriousness of the underlying offense. (Lacey letter, *supra*, at p. 2.) The bill amended section 290 to create this three-tier system.

"While it sounds contradictory, California will greatly improve public safety by eliminating our current lifetime sex offender registration requirement and moving to a system where registered sex offenders are placed in a tiered system based on the severity of the offense. Law enforcement is spending too much of [its] finite sex offender supervision funding on paperwork of low risk offenders instead of focusing on managing and supervising high risk offenders that pose the greatest risk to public safety. Our Sex Offender Registry has become so large that it produces too many potential suspects when used to try and solve a sex crime case in many situations. By eliminating many of the low risk offenders from our registry both of these issues can be solved." (Lacey letter, *supra,* at p. 4.)

S.B. 384 keyed section 290's three tiers to specified offenses and established a minimum term of 10 years of registration for tier one, a 20-year minimum for tier two, and lifetime registration for tier three. (See § 290, subds. (d)(1)-(3).)

Under the amended system, the registration obligation does not end automatically after the minimum term. Rather, the sex offender must petition the court for termination. "The proposed termination section provides the courts with the ability to deny termination in certain circumstances (e.g., if continued registration would enhance community safety)." (Lacey letter, *supra,* at p. 3; see § 290.5, subd. (a)(1).)

A sex offender's petition to end the registration duty can be granted only after review by law enforcement, the district attorney, and the court. (Cal. Sex Offender Management Bd., *Year End Rep.*, p. 5 (2023) <https://casomb.org/pdf/2023_Year_

End_Report.pdf> [as of July 23, 2024], archived at <https://perma.cc/8EJS-4937> (2023 Year End Rep.).)

In 2023, as a result of S.B. 384, some 5,431 sex offenders successfully petitioned to have their registration duty terminated, while only about 105 petitions were denied. (2023 Year End Rep., *supra*, at p. 10.) It appears that, in many cases, prosecutors examined the situation and effectively stipulated to, or did not oppose, the petitions to terminate registration.

We now turn to the law governing Malbry's case, where the prosecution opposed his petition, and did so successfully.

### B

We affirm on any ground supporting the trial court's order. (*Pep Boys Manny Moe & Jack of California v. Old Republic Insurance Co.* (2023) 98 Cal.App.5th 329, 334–335.) It is unnecessary for the trial court to have stated the right rationale if its result is legally proper. We review for an abuse of discretion and affirm subsidiary factual findings based on disputed facts if substantial evidence supports them. We independently review legal findings, including questions of statutory construction. (*People v. Franco* (2024) 99 Cal.App.5th 184, 192–193 (*Franco*).)

### C

The governing statute is section 290.5. We quote its text, adding bracketed numbers to highlight seven factors the Legislature made relevant.

"If the district attorney requests a hearing, the district attorney shall be entitled to present evidence regarding whether community safety would be significantly enhanced by requiring continued registration. In determining whether to order continued registration, *the court shall consider*: [1] the nature and facts of the registerable offense; [2] the age and number of

12

victims; [3] whether any victim was a stranger at the time of the offense (known to the offender for less than 24 hours); [4] criminal and relevant noncriminal behavior before and after conviction for the registerable offense; [5] the time period during which the person has not reoffended; [6] successful completion, if any, of a Sex Offender Management Board-certified sex offender treatment program; and [7] the person's current risk of sexual or violent reoffense, including the person's risk levels on SARATSO static, dynamic, and violence risk assessment instruments, if available."  (§ 290.5, subd. (a)(3), italics added.)

This provision identifies factors the trial court "shall" consider, but no language bars consideration of other relevant factors.  This point becomes significant below, when we discuss our disagreement with *Franco*.

The statute also does not say *how* a court should "consider" these factors.  The statute neither directs courts to weigh each factor equally nor specifies a particular formula for the calculus.  The Legislature evidently delegated these decisions to the courts.  (Cf. Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement* (2006) 94 Calif. L.Rev. 1581, 1585–1586 [multifactor tests are common in law, prevailing in "wide and diverse" settings that include trademark, copyright, takings, evidence, conflict of laws, and criminal law].)

Typically, courts confronting a multifactor test treat the individual factors as neither exhaustive nor dispositive, but rather as useful guideposts.  (E.g., *Smith v. Doe, supra*, 538 U.S. at p. 97.)

D

We apply the seven statutory factors.

13

## 1

Factor one is "the nature and facts of the registerable offense." (§ 290.5, subd. (a)(3).)

Three features of the registerable offense dominate this analysis: the number of Malbry's violations; his compulsion to continue daily until caught; and the Legislature's post-conviction determination that this kind of offense conduct is especially dangerous.

### a

The number of violations was large. Every weekday for three years means hundreds of violations. A considerable number of offenses suggests considerable danger.

### b

As a separate matter, Malbry's drive to offend *daily* proves a strong sexual compulsion. Malbry did not govern his compulsion, except to avoid detection on the weekends, when the girl's mother was home. Malbry did not moderate or stop until police apprehended him. A high rate of offending suggests a high level of danger.

### c

The nature of Malbry's offense shows special danger. The Legislature said so. Malbry's conduct would have violated section 288.7, which the Legislature passed years after Malbry's conviction. According to section 290 as it stands today, a conviction under section 288.7 would have rendered Malbry a tier three offender, which in turn would have required lifetime registration.

The prosecution correctly argues this consideration supports the trial court's denial of Malbry's petition.

14

We explain section 288.7, which is a significant factor in this case.

Years after Malbry's 1991 conviction, in 2006, the Legislature enacted section 288.7. (Stats. 2006, ch. 337, § 9.)

The statute provides that adults who engage in sexual intercourse with a child who is 10 years of age or younger are guilty of a felony and shall be punished by imprisonment in state prison for a term of 25 years to life. (§ 288.7, subd. (a).) People convicted of violating section 288.7 are tier three offenders who must register for life. (§ 290, subd. (d)(3)(C)(xiv).) This status would preclude relief under section 290.5. (§ 290.5, subd. (a)(1) [only tier one and two offenders may petition for relief].)

This post-conviction change in the law is relevant to an assessment of Malbry's current danger to the community because it demonstrates heightened public concern about Malbry's offense conduct: adult sexual intercourse with a young child. Although not decisive, this point is pertinent. It supports the trial court's order.

That Malbry's penetrations of the girl may have been partial does not mitigate Malbry's danger to the community. Young children are smaller than adults, meaning some acts are physically difficult or impossible. The law treats partial penetrations the same as other penetrations. (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 ["any penetration, no matter how slight"].)

To summarize, factor one suggests Malbry is a community risk. The weight of this factor is substantial, and distinguishes this case from others involving isolated and less dangerous conduct. (E.g., *People v. Thai* (2023) 90 Cal.App.5th 427, 430 [one episode of masturbating a 12-year-old boy].)

### 2

Factor two is "the age and number of victims." (§ 290.5, subd. (a)(3).)

There was only one victim, but the child was very young: in the range of kindergarten to third grade. Children this age tend to be naive, vulnerable, and trusting. Malbry's willingness to prey upon a kindergartener increases the danger he poses, because the very young are less likely to realize a situation is perilous and are less able to extricate themselves. These members of a community are among its most vulnerable.

Factor two suggests heightened risk to the community.

### 3

Factor three is "whether any victim was a stranger at the time of the offense (known to the offender for less than 24 hours)." (§ 290.5, subd. (a)(3).)

Malbry was not a stranger. He was a member of the household. The girl called him "Daddy."

The California Sex Offender Management Board reported that about 93% of sex offenses against children were committed by people the victim knew, not by strangers. (Tiering Paper, *supra*, at p. 2.) Malbry thus belonged to the category posing the greatest danger to children.

This fact is descriptive. We are unsure it is predictive. We give this factor no weight because its implications are ambiguous.

### 4

Factor four is "criminal and relevant noncriminal behavior before and after conviction for the registerable offense." (§ 290.5, subd. (a)(3).) The offense of conviction is the only crime on Malbry's record. This factor mitigates risk.

## 5

Factor five is "the time period during which the person has not reoffended." (§ 290.5, subd. (a)(3).) Malbry has gone for more than three decades without reoffending. This factor mitigates risk.

## 6

Factor six is "successful completion, if any, of a Sex Offender Management Board-certified sex offender treatment program." (§ 290.5, subd. (a)(3).)

Malbry has not sought counseling or therapy. He has made no effort to gain professional or systematic help to understand why he so persistently exploited a grade schooler. (Cf. *Franco*, *supra*, 99 Cal.App.5th at p. 189 [petitioner showed "the progress he made in psychotherapy sessions, completion of a counseling program, and willingness to admit to the crimes and show remorse"].)

This factor strongly suggests a risk to the community.

## 7

Factor seven is "the person's current risk of sexual or violent reoffense, including the person's risk levels on SARATSO static, dynamic, and violence risk assessment instruments, if available." (§ 290.5, subd. (a)(3).)

Malbry's current risk of sexual reoffense is substantial because he has demonstrated no insight into his misconduct.

Wrongdoers gain insight by fully appreciating the harm they caused. Coupling that appreciation with acceptance of responsibility and sincere regret can yield some confidence that wrongdoers truly want to mend their ways.

Conversely, people may not change if they see no real reason or need to change.

17

*In re Shaputis* (2011) 53 Cal.4th 192, 218, for instance, spoke to these points in the context of parole determinations. (*Ibid.* ["the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety"]; *id.* at p. 219 ["[L]ack of insight pertains to the inmate's current state of mind, unlike the circumstances of the commitment offense. . . . Thus, insight bears more immediately on the ultimate question of the present risk to public safety posed by the inmate's release"]; *id.* at p. 220 ["Rational people, in considering the likely behavior of others, or their own future choices, naturally consider past similar circumstances and the reasons for actions taken in those circumstances. Petitioner's argument that the inmate's insight should play no role in parole suitability determinations flies in the face of reason."].)

Further authorities are available but unnecessary. Insight into wrongdoing is a commonsense factor in judging whether someone is likely to do better.

Malbry has not admitted error, has not apologized, and has not vowed to change. His plea was "no contest," not "guilty."

This absence of contrition and lack of a commitment to change tend to counterbalance his decades of law-abiding conduct.

This factor strongly suggests Malbry poses a risk to the community.

Malbry's papers prominently cite his age, obliquely suggesting he is too old to cause social harm. The notion someone in his seventies cannot, or is unlikely to, commit sexual assault lacks a basis in the record.

The statute's reference to SARATSO is to the State Authorized Risk Assessment Tools for Sex Offenders, which section 290.04 mandated in 2006. (See *People v. Toussain* (2015) 240 Cal.App.4th 974, 980–983 [reviewing SARATSO provisions].) Malbry's release from prison predated the SARATSO regime. (Cf. § 290.06, subd. (a)(1) [assessment should take place at least four months before release from incarceration].) Neither side requested a SARATSO evaluation. Malbry's appellate counsel offers his own evaluation in his brief, but the prosecution rightly responds this assessment is to be applied by trained and impartial professionals and not by partisan advocates. (See SARATSO, *Training Information* (2024) <https://saratso.org/index.cfm?pid=1357> [as of July 23, 2024], archived at <https://perma.cc/43ZZ-K384> ["SARATSO must certify all scorers on the risk instruments"]; 2023 Year End Rep., *supra*, at p. 24 ["All scorers and trainers must pass an initial training and then be recertified every two years on the instrument(s) they use."].) In this situation, the absence of a SARATSO evaluation does not weigh one way or the other.

\* \* \* \* \*

Qualitatively, the record showed "community safety would be significantly enhanced by requiring continued registration." (§ 290.5, subd. (a)(3).)

Weighty factors are the number of Malbry's violations, his compulsion to continue daily until caught, the Legislature's determination that this conduct is especially dangerous, and Malbry's willingness to prey on a vulnerable child. Important as well is Malbry's lack of effort to give a court confidence that he is a changed person: no words of insight, and no deeds of therapy. He has gone decades without reoffending, but Malbry refrained

from abusing the girl when her mother was home to avoid getting caught; these assault-free weekends did not show Malbry then was harmless. By the same token, the crime-free decades do not now outweigh the signs that Malbry continues to pose a significant community hazard.

## E

The post-conviction passage of section 288.7 is relevant and counts against Malbry's petition. We respectfully disagree with the recent *Franco* decision, which rejected the relevance of section 288.7.

The prosecution in *Franco* argued the defendant there "could have been charged—and likely convicted—of violating section 288.7, a statute that was not enacted until 2006 . . . ." (*Franco*, *supra*, 99 Cal.App.5th at p. 194.) The prosecution contended "the nature of the offense by itself establishes a perpetual likelihood of reoffending and thus may permissibly be viewed as *controlling*." (*Id.* at p. 195, italics added.)

This is similar, although not identical, to the argument the prosecution makes in Malbry's case. The prosecution here argues this factor is relevant, not "controlling." (See *Franco*, *supra*, 99 Cal.App.5th at p. 195.)

The *Franco* decision rejected the prosecution's argument:

"Although this argument is not without some logical gravity, we nevertheless reject it because sections 290 and 290.5 did not adopt this approach. These statutes hinge the designation of tiers (and hence the minimum duration of registration as a sex offender) on whether the defendant 'was convicted' of certain crimes (§ 290.5, subd. (d)(2), (3)(C))—not on whether the defendant 'could have been convicted' of other crimes, including crimes that did not yet exist at the time the sex

20

offense was committed.  Our Legislature has, in other contexts, tasked the courts with independently determining whether a criminal defendant previously convicted of a particular crime under a particular theory might still be guilty of the same crime under a different theory or, failing that, guilty of a different crime.  (See, e.g., § 1172.6.)  By explicitly tying tier placement to the offense of which the defendant 'was convicted,' our Legislature in sections 290 and 290.5 *opted not to follow this other approach*.  We cannot gainsay our Legislature's choice." (*Franco*, *supra*, 99 Cal.App.5th at p. 195, footnote and citations omitted, italics added.)

The implicit premise was that sections 290 and 290.5 are inconsistent with section 288.7:  that the former adopted one approach and section 288.7 adopted "*this other approach*." (*Franco*, *supra*, 99 Cal.App.5th at p. 195, italics added.)

We have a different perspective than our colleagues.  In our view, sections 288.7, 290, and 290.5 are consistent:  they serve the same purpose and can be read harmoniously.  Section 288.7 is a legislative judgment informing sections 290 and 290.5.  Nothing in these statutes renders section 288.7 irrelevant to analyses under sections 290 and 290.5.

We interpret statutes to harmonize them.  (E.g., *Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 175 [courts should construe statutes together and give effect to all parts of the statutory scheme].)

This canon of interpretation is basic.  (E.g., *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090–1091 (*Lexin*); Scalia & Garner, Reading Law:  The Interpretation of Legal Texts (2012) p. 252.)

21

These statutes have the same purpose, which is efficiently protecting the public from sex offenders.  (Cf. *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135 [when construing statutes, the fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute].)

To put the plain English into Latin, these statutes are *in pari materia.*  (*Lexin, supra,* 47 Cal.4th at pp. 1090–1091.)

The post-conviction passage of section 288.7 is relevant because it demonstrates a changing public attitude about the danger of sexual abuse of young children.  When assessing the current risk Malbry might pose, it is appropriate for courts to take note of legislative actions bearing on the question.

Section 288.7 has expressed a new and significant legislative judgment about dangerousness.  When Malbry was convicted, adult sexual intercourse with a child under 10 was generally illegal but was not the target of focused and heightened attention in California's criminal law.  The public view today, however, is that adult intercourse with a young child is gravely dangerous and must be deterred with the severe penalty of 25 years to life in prison.  The Legislature passed section 288.7 to express this magnified concern.  Sections 288.7, 290, and 290.5 thus are complementary. They are not antithetical.

We do not hold Malbry's petition should be denied because he could have been convicted of violating section 288.7.  Rather, the enactment of section 288.7 is significant because the Legislature, by increasing the penalty for adult sexual intercourse with a child under 10, expressed its view that this conduct posed a greater community hazard than previously thought.  This legislative assessment influences our view of Malbry's present risk to the community.

22

We depart from *Franco*'s analysis on this point.

In any event, *Franco* is distinguishable from Malbry's case. In *Franco*, the petitioner committed a single act of sexual intercourse with a young girl. (*Franco*, *supra*, 99 Cal.App.5th at p. 188.) Malbry offended hundreds of times, on a daily basis. And the petitioner in *Franco* touted "the progress he made in psychotherapy sessions, completion of a counseling program, and willingness to admit to the crimes and show remorse" and other factors that Malbry has omitted to mention. (*Id*. at p. 189.)

In sum, *Franco* does not show this trial court erred in finding "community safety would be significantly enhanced by requiring continued registration" by Malbry. (§ 290.5, subd. (a)(3).)

E

In a one-sentence argument, Malbry contends that, for the reasons he "discussed above" in his appellate brief, we should "reverse the part of the court's order precluding Mr. Malbry from filing another petition for a three-year period and instead remand with directions that Mr. Malbry be allowed to file a new petition after the minimum one-year period." Malbry's opening brief devoted no additional logic or authority to this point.

We decline to decide a separate issue on the basis of rote incorporation of reasoning "discussed above." Malbry's single sentence is insufficient to summon a further decision on a new topic. (E.g., *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482.)

////

23

## DISPOSITION

We affirm the order.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.